**UNITED STATES of America, Appellee,**

**v.**

**Raul ESTREMERA, Defendant-Appellant.**

**No. 484, Docket 75-1261.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 18, 1975.

Decided Feb. 2, 1976.

Certiorari Denied May 19, 1976.
See 96 S.Ct. 2184.

---

Jesse Berman, New York City (Michael D. Ratner, Lawrence Stern, New York City, of counsel), for appellant.

Jeremy G. Epstein, Asst. U. S. Atty. (Thomas J. Cahill, U. S. Atty., S.D.N.Y., John D. Gordan, III, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before FEINBERG, MANSFIELD and GURFEIN, Circuit Judges.

MANSFIELD, Circuit Judge:

After a five-day trial in the Southern District of New York before Judge Kevin T. Duffy, a jury on May 23, 1975, found defendant Raul Estremera guilty on all counts of an indictment charging him and three others with bank robbery (Count 1), bank larceny (Count 2), and armed bank robbery (Count 3), in violation of 18 U.S.C. § 2113(a), (b) & (d). Upon this appeal from the resulting conviction and 17-year sentence, Estremera claims several reversible errors. We affirm.

The evidence, viewed in the light most favorable to the government, discloses a bank-robbery scenario duplicating what has in recent years become all too common in New York City and vicinity. On February 9, 1973, four armed men, Oscar Lee Washington, Victor Cumberbatch, Pedro Mario Monges, and a person later identified as the defendant Raul Estremera, entered a Bronx branch of the First National City Bank. Surprising the bank guard and other personnel, the men ordered all those in the bank to lie on the floor while the bank manager, James Bolla, led Monges and Washington to the cash drawers, from which the two looted $25,321.75. Cumberbatch meanwhile beat the assistant bank manager, Albert Randall, with his submachine gun and proceeded to rob him of his valuables. Similarly Estremera removed a wallet from the bank guard, Rodolfo Romero, who was then lying face down on the floor, and then relieved Romero of his watch, at which point Romero turned and looked directly at Estremera's face, now just inches away. Most of this was recorded on bank surveillance cameras, which were activated within a short time after the robbery began. Approximately 44 photographs of the robbery in progress were later introduced at trial.

The robbers departed in two automobiles, driving to a spot some six blocks from the bank, where they entered a red Ford van and another vehicle. Leroy Irvin, a resident of the street, observed the change in cars and noted the license number of the van, which belonged to Alberto Estremera, appellant's brother.

On February 15, police officials in Brooklyn located the Ford van and arrested Washington as he entered the vehicle. Later during the afternoon, the police arrested Alberto Estremera at a Brooklyn address where they also uncovered weapons and contraband currency. Appellant, aware of these two arrests, asked two friends, Frank Negron and Wayne Barrett, for assistance in avoiding capture, seeking a place to stay, money, and a pair of clear eyeglasses. His friends provided Estremera with an apartment and placed an order for the desired spectacles. On the same date, agents of the Federal Bureau of Investigation exhibited

to Rodolfo Romero a spread of six photographs, including that of defendant but not including a picture of his brother Alberto, who looked somewhat like appellant. The bank guard immediately identified appellant as one of the bank robbers. The agents also presented the same series of photographs to Kenneth Jackson, the head teller at the bank, who was in the building's basement during the robbery. From a vantage point near the basement stairs Jackson had been able to observe the person later identified by him as Estremera from a distance of less than 15 feet. Both selected defendant's picture from the photographic array.

The February 15, 1973, arrest of Alberto Estremera had been accompanied by a search of his apartment. Upon challenge to its legality, the government agreed not to employ the fruits of the search and concomitant seizures. On February 26, 1973, the government consented to the dismissal of its case against Alberto,[1] who had been briefly represented in connection with a bail application by Jesse Berman, Esq., the same attorney who was later to appear on behalf of Raul in this case. On March 3, 1973, the government filed its first indictment against appellant and Washington. A superseding indictment adding Monges and Cumberbatch as defendants followed on April 12, 1973.[2] Appellant failed to appear for arraignment on either occasion and bench warrants were issued. The government was unaware of his whereabouts until January 30, 1974, when Canadian authorities advised FBI Agent Edward McShane, stationed in Plattsburgh, New York, that defendant had recently been arrested for auto theft in Canada. This message was relayed to the New York authorities responsible for the bank robbery investigation.

McShane, who maintained liaison with Canadian immigration officials, contacted Robert Quintal of that country's Department of Manpower and Immigration concerning Estremera and learned that deportation proceedings would be initiated since, in addition to his having been charged with theft of an automobile in violation of Canadian law, Estremera had an American criminal record consisting of a conviction for malicious mischief and had entered Canada from the United States under a false name. On April 1, 1974, the Canadian Immigration Court of Appeals, over defendant's objection, ordered his deportation. He appealed to the Federal Court of Appeals in Canada, which on October 30, 1974, dismissed the deportation proceedings, ruling that since Estremera's sole conviction in the United States was for a misdemeanor he was not deportable as an undesirable alien. On the very next day, the United States Attorney for the Southern District of New York requested that Canadian authorities detain appellant pending extradition. On November 15, 1974, a Canadian Federal Court Judge issued an order for his extradition which became effective on January 3, 1975, following exhaustion of Estremera's appeals.

Returned to the United States on January 6, 1975, appellant was brought to New York City and arraigned. At the trial, which followed in May 1975, the government rested its case principally upon the bank surveillance photographs, the identification of appellant by James Bolla, the bank manager, and Rodolfo Romero, the bank guard, both of whom testified, and testimony by Frank Negron regarding appellant's post-robbery request for help in avoiding capture. The court excluded as irrelevant testimony of one Ruben Matias that shortly prior to the robbery appellant had transported guns and ammunition from California to New York where they were unloaded with the help of Washington and

1. The record is unclear as to whether the prosecutors felt compelled to dismiss the charge against Alberto because of the invalid search or because independent evidence indicated Alberto's noninvolvement. As shall be seen *infra,* establishing that Alberto rather than appellant participated in the bank robbery was to become appellant's defense strategy.

2. Prior to trial, Washington and Monges both entered pleas of guilty to Count 1 of the indictment and were each sentenced to 18 years imprisonment. Cumberbatch still awaits trial.

Cumberbatch and that appellant had shortly thereafter alluded to "planning to do another job in New York."

Appellant did not take the stand. However, the defense sought to cast doubt upon the identification of appellant by offering evidence to the effect that the robber probably was appellant's look-alike brother, Alberto. Appellant's attorney, Jesse Berman, Esq., who had also been Alberto's attorney when he previously had been arrested for the robbery, undertook shortly before trial to discredit the identifications of appellant as the robber by inducing Alberto to dress in an outfit similar to that worn by the robber in the bank's surveillance photos (including coveralls, construction helmet and gloves), and to pose for several photographs in Berman's office, photographs that depicted Alberto in substantially the same postures and attitudes as those of the person appearing in the bank photos. On March 14, 1975, Berman showed to Kenneth Jackson, the bank teller, a photographic array consisting solely of photos of Alberto. Not surprisingly, in view of the similarity in appearance of the brothers and the passage of some two years since the robbery, Jackson identified Alberto as the robber and endorsed the back of the pictures accordingly. At trial, however, when asked to select among a series of photographs that included one of Alberto and the February 15, 1973, array used by the FBI, which contained appellant's likeness, Jackson selected defendant as the individual most closely resembling the robber.

At trial Bolla, the bank manager, a government witness, identified appellant and testified that a few weeks earlier he had selected appellant's photograph as that of one of the robbers from a photographic spread shown to him by appellant's attorney, Berman. Berman took the witness stand at trial and testified that on March 14, 1975, he had shown Bolla a photographic spread containing Alberto's picture, but not appellant's, and that Bolla identified Alberto as the robber. However, Bolla was not asked to initial or endorse the photograph

of Alberto, as had Jackson. A similar defense attempt to discredit Rodolfo Romero's prior identification was unsuccessful as he failed to select Alberto as the robber.

Both prior to and during trial, defendant made a variety of motions which form the bases of this appeal. We will consider additional factual matters underlying these motions in the discussion that follows.

## DISCUSSION

### Claim of Denial of Speedy Trial

Appellant first argues that the indictment must be dismissed because of the government's alleged failure to comply with Rule 4 of the Plan for Achieving Prompt Disposition of Criminal Cases of the Southern District of New York, which requires that the government ready itself for trial within six months of arrest or the filing of the indictment, which ever is earlier, unless one or more of the tolling provisions found in Rule 5 are satisfied. The pertinent provisions of Rule 5 are § (d), which excludes the period during which the defendant is absent or unavailable and (f), which excludes

> "The period of delay resulting from detention of the defendant in another jurisdiction provided the prosecuting attorney has been diligent and has made reasonable efforts to obtain the presence of the defendant for trial."

Defendant concedes that the government cannot be charged for the delay occasioned by the period of April 12, 1973, through January 30, 1974, when Estremera was a fugitive, Rule 5(d), or by the period postdating October 31, 1974, when the government initiated steps for extradition. He argues, however, that the delay of nine months in requesting extradition following appellant's January 1974 arrest in Canada and encompassing the pendency of the deportation proceedings should bar prosecution. In effect, he contends that the government's decision to defer extradition until deportation failed cannot qualify as "diligent" or as "reasonable efforts to obtain the presence

of the defendant for trial" as mandated by Rule 5(f). We disagree.

■ The uncontroverted evidence demonstrates that as of January 1974, both American liaison agent Edward McShane and Canadian immigration officials reasonably believed on the basis of experience that defendant was properly subject to deportation from Canada and that normally deportation would be the least protracted or cumbersome remedy employed in such circumstances in view of Estremera's use of an alias to gain entry into Canada, his prior American conviction, his arrest in Canada, and the pending charges against him in New York. The deportation proceedings progressed expeditiously and smoothly, as indicated by the Canadian immigration court's April 1, 1974, finding of deportability, until the Canadian Federal Court dismissed the case, roughly nine months after it was commenced, because the prior conviction was for a misdemeanor. Under the circumstances, the fact that the prosecutors, along with Canadian immigration officials and the highest Canadian immigration tribunal, proved to be mistaken in their reliance on deportation hardly establishes that the government acted unreasonably or without diligence in following this time-proven course, see *United States v. Oliver,* 523 F.2d 253 (2d Cir. 1975); cf. *United States v. Cangiano,* 491 F.2d 906 (2d Cir.), *cert. denied,* 419 U.S. 904, 95 S.Ct. 188, 42 L.Ed.2d 149 (1974). To permit appellant, who used every tactic at his command to remain outside the United States in order to prevent a speedy trial, to benefit from the government's mistaken reliance upon deportation procedures in lieu of initiating extradition proceedings, would be to pervert the Prompt Disposition Rules by rewarding a defendant for his own obstruction of a speedy trial.

*The Double Jeopardy Claim*

Appellant next contends that his conviction is barred by the Double Jeopardy Clause. He argues that the prosecuting attorney, fearing an unfavorable outcome to the trial and with a view to obtaining "another, more favorable opportunity to convict the accused," *Gori v. United States,* 367 U.S. 364, 369, 81 S.Ct. 1523, 1527, 6 L.Ed.2d 901 (1961), deliberately provoked him to move for a mistrial, which was at first granted by the court but then vacated when the defendant insisted on proceeding with the trial, resulting in a guilty verdict. First a few words about the background.

Prior to and during the trial appellant's counsel had, in his zeal to obtain an acquittal, engaged in conduct raising doubts regarding his understanding of his professional responsibility. Despite the obvious conflict of interest between the brothers Alberto and Raul, each of whom had been successively arrested for the robbery, Berman sought to disprove the identification of Raul, his present client, by implicating Alberto, his former client, whom he induced to pose for photographs which would make Alberto appear to be the robber. Then, in an effort to confuse Kenneth Jackson, an eyewitness to the robbery, into believing that Alberto was the robber, he used the all-Alberto photographic spread which was beyond question impermissibly suggestive. See, e. g., *Brathwaite v. Manson,* 527 F.2d 363 (2d Cir. 1975). The logical effect of Jackson's identification, unless corrected (as it later was when he had the opportunity at trial to compare photographs of Alberto and appellant), was to incriminate Alberto. Indeed in his summation Berman explicitly argued that it was Alberto rather than Raul who had participated in the robbery.

Faced with testimony by Bolla to the effect that he had selected appellant's photograph from a spread shown to him by Berman, Berman took the witness stand to contradict Bolla's testimony, a step permitted only where unavoidable. *United States v. Alu,* 246 F.2d 29, 33 (2d Cir. 1957); ABA Code of Professional Responsibility, Canon 5, DR5–10(B), 5–102(A). It is unclear why Berman had not followed the procedure used by him on the same day when he interviewed Jackson, of having the witness put his own identifying mark on the back of

the photograph identified by him, and why he had not in the first place obtained a court order under the Criminal Justice Act authorizing him to hire an independent investigator, see 18 U.S.C. § 3006A(e), rather than himself play that role.

In his summation defense counsel, furthermore, flatly misstated the testimony of Frank Negron on a material issue, i. e., whether appellant had been in New York shortly prior to the time of the robbery. On cross-examination Negron had testified that he had not seen appellant for about two weeks prior to February 15, 1973 (the robbery occurred on February 9, 1973), but when asked whether appellant "was not in New York?" he answered "I figure he probably was." This testimony was excluded by the court on the ground that it was getting into the area of speculation. Nonetheless, in his summation appellant's counsel repeatedly advised the jury that Negron had testified that appellant had not been in New York for at least two weeks prior to February 15.[3] Furthermore, without any evidentiary basis defense counsel portrayed appellant as a peaceful member of the antiwar movement rather than simply as a draft evader. The purpose of this statement apparently was to persuade the jury that his client would not be likely to engage in the violence associated with a bank robbery.

In response to Berman's repeated reference to Jackson's selection of Alberto's photograph from the all-Alberto photographic spread prepared by defense counsel, the prosecutor in summation pointed out that the impermissibly suggestive method used by Berman was just as improper as if it had been employed by the government. In reply to Berman's repeated misstatement of Negron's excluded testimony regarding appellant's whereabouts at the time of the robbery the Assistant U.S. Attorney quoted Negron's testimony to the jury. In reply to defense arguments that the in-court identification of appellant by certain witnesses was unfair, the government argued that defense counsel could have demanded and obtained an in-court line-up if he had wanted one; and in reply to the argument that appellant was a draft resister because he was opposed to the Viet Nam war, the prosecutor argued that the appellant had not chosen a non-violent alternative service but had resorted to bank robbery.

At the close of the government's summation the defense moved for a mistrial on the ground that the government's foregoing responses were improper. For reasons that are unclear on the record, Judge Duffy granted the motion.[4] Thereupon defense counsel, after consulting with his client, withdrew his motion and the case proceeded to the jury, which convicted.

If the court's initial grant of a mistrial was based on the theory that the government's summation was improper, it was clearly erroneous. In view of the defense's provocative improprieties, the government's remarks were hardly of a sufficiently prejudicial character to warrant such drastic relief. Indeed the defense's repeated misstatement of Negron's testimony, as the

---

**3.** In his summation Berman stated:

"Frank [Negron] told us that Raul was not in New York for at least two weeks prior to February 15, the day that Frank saw him." (Transcript p. 411).

"Frank [Negron] said that he hadn't been in New York for at least two weeks before." (Transcript p. 412).

"The evidence shows you, our evidence and theirs, shows you why it is not Raul Estremera. Raul Estremera has pleaded not guilty and he denies being the bank robber. He was out of town when the bank robbery happened. The draft board letter reached

him in Utah on either February 9 or 10th, 1973.

"Frank [Negron] told you that Raul had been out of town for two weeks prior to February 15, 1973." (Transcript p. 442).

**4.** The record is somewhat ambiguous on this score. The trial judge expressed concern that the government's statements concerning defense counsel's improper conduct, coupled with the unusual fact that defense counsel had also served as a defense witness in the case, may have prejudiced the defense. Trial transcript at 479.

trial judge seemed to indicate, surely required correction. While the prosecutor should not have quoted excluded testimony, even though it had been excluded upon his own objection, defense counsel's summation had reopened the matter by misstating the witness' testimony. The prosecutor's quotation merely served to confirm this fact. Nor was there any impropriety in the government's argument that if defense counsel believed that the in-court identification of appellant was staged or unduly suggestive he could have obtained an order requiring an in-court line-up. This procedure, although not routine, has on occasion been allowed and Judge Duffy's earlier denial of a pretrial line-up did not close the door to one during the trial. See *Brathwaite v. Manson, supra*, at 367 n. 6.

■ Assuming that the trial judge's declaration of a mistrial was justified, the fact that it was granted in response to appellant's own motion would ordinarily bar his double jeopardy claim. *United States v. Jorn*, 400 U.S. 470, 489, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (Stewart, *J.,* dissenting); *United States v. Tateo*, 377 U.S. 463, 467, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); *United States v. Goldstein*, 479 F.2d 1061 (2d Cir. 1973). Appellant, however, seeks to circumvent this established rule by reliance upon suggestions found in several cases that intentional prosecutorial efforts to prejudice a trial, thereby hoping to precipitate a mistrial and subsequent reprosecution, can activate double jeopardy protection even if defendant, in exercising his tainted choice, allowed the case to proceed to the jury. See, e. g., *Illinois v. Somerville*, 410 U.S. 458, 464, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *United States v. Jorn*, 400 U.S. 470, 485 n. 12, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (plurality opinion); *United States v. Tateo*, 377 U.S. 463, 468 n. 3, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); *United States v. Gentile*, 525 F.2d 252 at 257 n. 3 (2d Cir. 1975).

■ While we do not dispute appellant's reading of the law, no case has yet found a sufficient degree of governmental miscon-duct to preclude prosecution, and we do not believe that this one qualifies as the first. Indeed, the record falls far short of supporting this serious claim. Although the trial was a heated one in which the prosecutor's summation was aggressive and hard-hitting, there is no basis for an inference that the prosecutor was bent on intentionally sabotaging the trial. If, indeed, he was guilty of any impropriety in his remarks, it was in direct response to improprieties on the part of defense counsel, which is regrettably a factor that must be considered in measuring the permissible limits of the government's summation.

■ In any event, by deliberately withdrawing his motion and rejecting the proffered mistrial after careful review with his counsel and after Judge Duffy had not only coupled his grant with a ruling that a new trial would be held but through interrogation assured himself that appellant understood the consequences of withdrawal, appellant clearly waived any possible claim of double jeopardy. Appellant, of course, could have accepted the grant of a mistrial and raised his double jeopardy argument if and when the government sought reprosecution, appealing from any adverse ruling. *United States v. Beckerman*, 516 F.2d 905 (2d Cir. 1975). Instead, he obviously decided that his position before the empaneled jury was not so prejudiced as to require that he try again before another group of twelve. Thus, in refusing the mistrial offer, he implicitly expressed a willingness to take his chances with the case as then presented, and we are not inclined to allow him to hedge his bets by seeking acquittal by the jury and then, if convicted, demand reversal on grounds of double jeopardy.

### Denial of Appellant's Motion for a Pretrial Line-Up

In March 1975, two months prior to trial, appellant moved for permission to appear in a constitutionally proper line-up to be viewed by all eyewitnesses whom the government proposed to call at trial. The motion was denied by Judge Duffy on the

ground that the earlier photographic line-up was sufficient and on the further ground—one we have difficulty following—that such a line-up would be a "detriment" to the defendant since "any witness who identified the defendant on trial would have the opportunity to identify him in person, just, you know, like a week before trial." Appellant now argues that the denial was a violation of his rights to confrontation and equal protection, as well as an abuse of discretion. We disagree.

■ It is now established that a defendant has no constitutional right to a line-up. *United States v. Boston*, 508 F.2d 1171, 1176–77 (2d Cir. 1974), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975); *United States v. Ravich*, 421 F.2d 1196, 1203 (2d Cir.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970); *United States v. McGhee*, 488 F.2d 781, 786 (5th Cir.), *cert. denied sub nom. Bunner v. United States*, 417 U.S. 949, 94 S.Ct. 3077, 41 L.Ed.2d 670 (1974); *United States v. Hurt*, 155 U.S.App. D.C. 217, 476 F.2d 1164, 1168 (1973); *United States v. Hall*, 437 F.2d 248, 249 (3d Cir.), *cert. denied sub nom. Knight v. United States*, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971). However, a court-ordered line-up may be granted by the trial judge in the exercise of his discretion and if the request is made promptly after the crime or arrest it may be of value to both sides. Whether Judge Duffy abused his discretion requires us to consider all relevant circumstances, including the adequacy and propriety of other identifications, the amount of time that had elapsed since the crime had occurred and the extent of change in the accused's appearance.

■ Turning first to the adequacy of the other methods of identification used by the government, the photographic identification conducted shortly after the robbery was clearly permissible under normal standards. Indeed the trial judge, after a pretrial *Sim-*

*mons* hearing, made a finding to that effect, stating that the photographs used were "sufficiently similar as not to be unduly suggestive." On the basis of our own examination of the photographic spread and of the record, this finding is supported by substantial evidence. The six photographs forming the spread look sufficiently alike to preclude the inclusion of appellant's picture from being labelled impermissibly suggestive. Further the photos were viewed six days after the robbery at a time when the image of the robber must have been reasonably fresh in the witnesses' minds, in contrast to the more than two years later when Estremera first moved for a pretrial line-up.

The problem raised by the government's photographic array is that, although permissible, it was not as scrupulously fair to appellant as it might have been had it included a likeness of his look-alike brother, Alberto. On February 15, 1973, when the FBI photos were shown to the eyewitnesses, Alberto, whose red van had been used by the robbers to flee the bank, was arrested and photographed as a suspect. Although 11 days later he was released for reasons unclear from the record, the fact that two years later one witness (Jackson) identified Alberto, albeit on the basis of defense's impermissibly suggestive spread [5] indicates that the government would have been better advised upon obtaining Alberto's photo (presumably a matter of days later) to stage another photographic identification in which it would use an array that included photographs of both brothers.

Despite this weakness we cannot label the February 15, 1973, photographic identification, in view of the similarity in appearance of the photographs and the probable unavailability of a photograph of Alberto until after the spread was shown, as improper or the denial of the motion for a pretrial line-up as reversible error. The motion made two years later for a pretrial

---

**5.** Appellant moved for a line-up on March 4, 1975, and Judge Duffy denied his request on March 10. The bank eyewitnesses were shown the defense's photographic spread of Alberto Estremera four days later on March 14.

line-up might well have been granted by the trial judge as a matter of convenience, since appellant could probably have obtained the equivalent of such a line-up when the witnesses later made their in-court identifications. However, the denial of the motions did not under the circumstances constitute an abuse of discretion. Compared with the permissible photographic identification made a few days after the robbery when memory was fresh, a live line-up two years later, when memories had probably dimmed, could claim little if any advantage unless Alberto was to be included with his brother. Yet, although Berman induced Alberto in March 1975 to participate in a private photographic session in Berman's office, there was no assurance that Alberto would be available for the requested line-up. Indeed in the application no mention was made of the desire to have Alberto and appellant appear together. Alberto did not attend the trial and the defense appears to have made little effort to insure his presence.[6] Furthermore, in view of the appellant's marked change in appearance since the time of the robbery, it is doubtful whether any significance could have been attached to a witness' inability to identify him two years later. In any event all of the major witnesses (Bolla, Romero and Jackson), when confronted with photographs of Alberto, appellant and others, positively identified appellant's photograph as that of the robber. The jury also had access to the series of bank surveillance photographs, including many facial shots of the robber at close range, against which to compare the physical appearance of appellant and the photos of Alberto and appellant. A close scrutiny of the photographs makes clear that the person in the robbery surveillance spread has some identifying features of defendant, which are not found in photos of his brother (eyebrow angle and roundish nose). We conclude, then, that the jury's factual determination should not be disturbed and that the absence of a line-up does not constitute reversible error.

### Government's Discovery Under Rule 16(c), F.R.Cr.P., of Photographs in the Possession of Defense

During a pretrial hearing the government, in response to a defense motion pursuant to Rule 16(c), F.R. Cr.P.,[7] for discovery, consented to production of certain evidence in its possession rather than awaiting a court order. One month later the prosecutor moved for the discovery of the all-Alberto photographic spread that the defense had assembled and exhibited to the witness Kenneth Jackson. Over defense objection the motion was granted, Judge Duffy finding it "material and reasonable." Appellant challenges the ruling, arguing that Rule 16(c) contemplates only reciprocal and contemporaneous discovery when both parties are compelled to perform pursuant to court order.

While appellant's reading provides a restricted and technical reading of the rule, we prefer a more liberal and practical inter-

---

6. Toward the close of the trial, defense attorney requested that the court forbid the prosecutor from arguing that the defense should have produced Alberto Estremera at trial in order to establish its theory that Alberto rather than the defendant committed the robbery. The defense informed the judge that in March, 1975, Alberto was subpoenaed to appear at trial, then scheduled to commence at the end of March. However, the trial date was later changed until May due to a conflict in defense counsel's schedule and the defense denied being able to locate Alberto in order to serve another subpoena. Trial Transcript at 396–97. The defense maintained that Alberto had left for a vacation several weeks before the trial began and thus was unavailable. Trial Transcript at 400.

7. Rule 16(c), F.R.Cr.P., reads in pertinent part:
 "If the court grants relief sought by the defendant under subdivision (a)(2) or subdivision (b) of this rule, it may, upon motion of the government, condition its order by requiring that the defendant permit the government to inspect and copy or photograph . . . tangible objects . . . which the defendant intends to produce at the trial and which are within his possession, custody or control, upon a showing of materiality to the preparation of the government's case and that the request is reasonable."

pretation. The government's voluntary turnover of desired material to defendant must be deemed to have been based upon the implied condition that the defense would reciprocate, if necessary, at a later date. Cf. *United States v. Milano,* 443 F.2d 1022, 1027, n. 1 (10th Cir.), *cert. denied,* 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 258 (1971). Before ordering subsequent discovery in such circumstances, the trial judge must first conclude, as did Judge Duffy here, that the government's request is both "material and reasonable" and not designed to harass defendants or to probe unfairly into the defense's strategy. But little would be gained in terms of fairness to defendants or efficient functioning of the adversarial system under the construction of Rule 16(c) urged by appellant, which would merely lead the government either to refuse a defendant's discovery requests except pursuant to a formal court order that would reserve the prosecutor's claim to reciprocity, or, alternatively, to assent voluntarily to defense's request only on the condition that the defendant agree to reciprocate. In either case the addition of such technical formalities would achieve nothing that cannot be gained from a liberal interpretation of the existing informal discovery process.

*Miscellaneous*

 We find no merit in the other points raised by appellant, which require little discussion.

There is no indication that the use of metal detectors at the court entrances and the presence of plainclothes marshals in the courtroom denied appellant a fair trial. Even though the panel of prospective jurors initially passed through the same entrance as the general public, it is mere surmise that the metal detectors were visible or caused any prejudice to defendant. See *United States v. Torres,* 519 F.2d 723, 727 (2d Cir. 1975). Furthermore, the presence of plainclothes marshals who do not perform their tasks in an unduly or unnecessarily conspicuous manner hardly represents any unfair prejudice to defendant. See, e.g., *Dorman v. United States,* 140 U.S.App.

D.C. 313, 435 F.2d 385, 397–98 (1970) (en banc) (presence of uniformed guards in the courtroom is not unfair prejudice); *United States v. Greenwell,* 418 F.2d 846, 847 (4th Cir. 1969) (same).

 Nor did Judge Duffy's denial of reimbursement to defense counsel under the Criminal Justice Act give rise to reversible error. The Criminal Justice Plan adopted by the Southern District of New York pursuant to 18 U.S.C. § 3006A, subsection IV(B), expressly provides that "no person shall select his own counsel from the panel of attorneys or otherwise." While we would not approve of a trial judge's mechanically appointing counsel under that Act solely on a rotational basis without at least giving consideration to the advisability of appointing from the panel a particular attorney specifically requested by an indigent, it is clear from the record that appellant's defense did not suffer. He was represented by counsel of his choosing who acted zealously in his client's interests, though not always with due regard for his ethical responsibilities, in the preparation, trial and appeal of the case. Had defendant's attorney required funds to employ an investigator in developing his defense, his counsel could, upon a showing of indigency and need, have obtained such assistance under 18 U.S.C. § 3006A(e) even though he had not been appointed pursuant to the Criminal Justice Act. Nor did the 17-year sentence fall outside the trial judge's legitimate discretion, in light of appellant's participation in the armed bank robbery. See *Dorszynski v. United States,* 418 U.S. 424, 440–41, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974); *United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); *United States v. Brown,* 479 F.2d 1170, 1172 (2d Cir.1973). Indeed, two of his coparticipants who entered pleas of guilty solely to Count 1 of the indictment were each sentenced to 18-year terms, and a panel of this court summarily affirmed the validity of that sentence against an attack similar to this one. *United States v. Washington,* 490 F.2d 1406 (2d Cir. 1974).

Affirmed.