THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRANK BATES, a/k/a FRANK BEY, Defendant-Appellant.

(No. 58967;

First District (5th Division)—January 24, 1975.

James D. Montgomery and Diane M. Kinnard, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Jerome Charles Randolph, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Frank Bates (hereinafter defendant) and a co-defendant, Ricky Smith, were jointly tried before a jury and found guilty of murder. Defendant was sentenced to a term of from 25 to 75 years. Smith does not join in this appeal.

On appeal it is contended that (1) the admission of the coerced testimony of the State's key witness violated defendant's right to due process of law and (2) the evidence produced by the State was insufficient to support defendant's conviction.

On March 5, 1972, at approximately 7:45 P.M., the body of Charles Donnell Mitchell was found in an alley behind a residence at 4719 South Langley, Chicago. An autopsy revealed that the cause of Mitchell's death was a bullet wound in the chest. Defendant and Ricky Smith were charged with murder.

At trial Penny Lewis testified for the State that she had known Mitchell for approximately 4 years prior to his death. She admitted that she is a drug addict and a prostitute. About a week before Mitchell's death she saw him at the Lady Woods Lounge at Madison and Oakley. Mitchell asked her to hold some heroin for him, and she placed it in her bra. He told her that he wanted to find customers for the narcotic. Later that evening she accompanied Mitchell to a "shooting gallery" located at 1965 West Warren. "A shooting gallery is a place where junkies go to take off, shoot dope." There were several people at the Warren Boulevard address. One of them was a man she knew as "Frenchy." When she arrived, an individual who claimed that he was a policeman was attempting to rob the people in the "shooting gallery." Mitchell and the others were able to subdue him and tie him up. Some time later defendant and Smith arrived. Mitchell told them that the man who was tied up had attempted to rob them of their heroin. Defendant and Smith took the man outside. When they returned, defendant accused Mitchell of being a liar. Defendant and Smith lined up everyone in the "shooting gallery" and began to conduct a search. She pulled out the drugs and some money which Mitchell had given her. As she was doing this, Mitchell ran out the door and escaped.

Mary Bryant testified for the State that at approximately 7 P.M. on March 5, 1972, she received a phone call from a man whose voice she did not recognize. The man told her that her son owed him $40. She responded, "Where is Donnell, can I speak to him?" Mitchell was put on the phone. He said, "Mama, you have $70 of my money, we are coming to get it." She replied, "Donnell, please * * * I don't have the money. Please don't bring no mens to my house * * *. You have to stand the consequences yourself." The conversation was then ended. Her son sounded nervous when he spoke to her.

George Mosely testified for the State that he was awaiting trial for violation of probation. His nickname is "Frenchy." On February 18 or 19 he had been at the "shooting gallery" and heard Mitchell ask defendant if he could sell heroin for him. Three days later Mosely saw defendant give some drugs to Mitchell and warn him "[i]f you fuck up my drugs or fuck up my money I am going to do something to you." Mosely was in the "shooting gallery" about a week before Mitchell's death. His testimony substantially corroborated that given by Penny Lewis concern-

ing the events of that day. He testified in addition that when Mitchell ran out of the "shooting gallery," codefendant Smith said, "Don't worry about that punk. We will get him."

On March 5, 1972, Mosely was at the shooting gallery. Defendant and Smith arrived and forced him to accompany them as they searched for Fred Brown who, they had been told, robbed two people at the shooting gallery. While they were searching for Brown, Mosely saw Mitchell walking on Damen Avenue near Madison Street. Defendant and Smith forced Mitchell into their car and asked him for $200. Mitchell said that his "woman" had $40 and that his mother had $70. Mitchell then directed them to Fred Brown's home. Brown's wife told them that she and her husband had been robbed and that Mitchell was a liar. Defendant hit Mitchell, accused him of lying and forced him back into the car. They drove to a gas station and parked within 3 feet of a public telephone. A call was placed to Mitchell's mother. Mosely's account of the conversation was substantially similar to that given by Mary Bryant. The call was made at approximately 6:30 or 6:45 P.M. After the phone call, defendant told Mosely:

> "Punk, you get out of this car and you better not tell nobody that we got Donnell and we're going to take him out south and do him a job."

Mosely testified that "do a job" is a slang expression meaning "kill."

On cross-examination Mosely testified that the State's attorney had not made any promises concerning the disposition of the charge pending against him. On March 8, 1972, he was picked up by two policemen and taken to a station where he was placed in isolation. He was ordered to remove his clothes and then an officer named Tidmarsh struck and kicked him. He was tied to a chair, beaten and threatened with revocation of his probation, whereupon he gave a statement implicating defendant in Mitchell's murder.

On redirect examination Mosely testified that he had not been beaten since the night he was taken into custody, and that his testimony was not the result of coercion or threats.

Chicago Police Officer Andre Zehm testified that he arrested defendant on March 20, 1972, at 4554 South Drexel where he was hiding. This address is approximately two blocks from the spot where Mitchell's body was found.

No evidence was presented on behalf of defendant.

OPINION

The State concedes that Mosely was "mistreated by some Chicago policemen" after he was taken into custody on March 8, 1972. Defendant

contends that due to this "mistreatment," Mosely's trial testimony must be deemed "coerced" and that the admission of such "coerced" testimony constitutes so great a deprivation of due process of law that his conviction must be reversed.

■■ Since this is an issue of first impression in Illinois, defendant has relied upon two recent Federal court decisions, *LaFrance v. Bohlinger* (1st Cir. 1974), 499 F.2d 29, and *Bradford v. Johnson* (E.D. Mich. 1972), 354 F.Supp. 1331, *aff'd*, 476 F.2d 66. We feel this reliance is misplaced. *LaFrance* deals exclusively with the use of a post-arrest statement, wrung from a witness through beatings and threats, for purposes of impeaching his trial testimony. *Bradford* merely stands for the proposition that testimony given under the *continuing* application of police and prosecutorial coercion is inherently untrustworthy and consequently its use at trial constitutes a denial of the accused's rights under the Fourteenth Amendment. It is to be noted that in *Bradford* the witness recanted his trial testimony in an affidavit "to the effect that his testimony at petitioner's trial was untrue and was given only because of fear for his personal safety and that of his family." (*Bradford*, at 1334.) In the instant case we do not believe that Mosely's trial testimony was the result of such continuing coercion. When asked on redirect examination whether he was testifying "under any coercion or threat," Mosely replied, "No, sir." The record further indicates that over 6 months elapsed between the date he was taken into custody and defendant's trial. There is absolutely no indication that during this time Mosely was again beaten or threatened. Moreover, there is no indication that Mosely testified falsely; key portions of his account of the events culminating in Mitchell's murder were corroborated by the testimony of Penny Lewis and Mary Bryant. On the basis of this record we have no doubt that Mosely's testimony was the "fruit of his own reflection and volition" and not the product of coercion. (*Brown v. United States* (D.C. Cir. 1966), 375 F.2d 310.) We therefore find no error in the admission of this testimony.*

Defendant has also contended that the State's evidence was insufficient to prove him guilty beyond a reasonable doubt. He claims that the State failed in its proof since it could produce only circumstantial evidence linking him to the murder.

■ To support a conviction based solely on circumstantial evidence "the facts proved must be consistent with defendant's guilt and incon-

---

\* Although we have held that under the facts and circumstances of the instant case defendant's right to due process of law has not been violated, we do not intend our holding to signify approval of the actions of those police officers who took Mosely into custody.

sistent with any reasonable hypothesis of innocence." (*People v. Murdock*, 48 Ill.2d 362, 367, 270 N.E.2d 21, 24.) However, the trier of fact is not required to search out a series of potential explanations compatible with innocence and elevate them to the status of a reasonable doubt (*People v. Russell*, 17 Ill.2d 328, 161 N.E.2d 309; *People v. Little*, 18 Ill.App.3d 1081, 311 N.E.2d 173) nor must it "disregard the inferences that flow naturally from the evidence before it." *People v. Owens*, 23 Ill. 2d 534, 538, 179 N.E.2d 630; *People v. Hayes*, 4 Ill.App.3d 997, 282 N.E. 2d 777.

■■ In the instant case George Mosely testified that approximately 2 weeks before the murder defendant gave Mitchell a quantity of heroin to sell. At that time defendant warned Mitchell, "If you fuck up my drugs or fuck up my money, I am going to do something to you." Approximately 1 week before the murder Mitchell, who apparently feared that defendant believed he had cheated him, fled from the "shooting gallery" when defendant and Smith began to search the occupants of that building. Codefendant Smith then told those present, "Don't worry about that punk. We will get him." On March 5, 1972, the date of the murder, Mosely testified that defendant struck Mitchell and called him a liar. Smith demanded that he produce $200. After Mitchell made a phone call to his mother in an unsuccessful attempt to raise the money, defendant told Mosely, "* * * you better not tell nobody that we got Donnell and we're going to take him out south and do him a job." Within an hour after defendant made this expression of his intent to kill him, Mitchell's body was found on the south side. Two weeks later defendant was found hiding in an apartment two blocks from where the body was found. We believe that this web of highly incriminating circumstantial evidence was sufficient to prove defendant guilty beyond a reasonable doubt, and therefore we affirm the judgment.

Affirmed.

LORENZ and SULLIVAN, JJ., concur.