THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT J. McKINLEY, Defendant-Appellant.

Second District (2nd Division)   No. 75-90

Opinion filed September 27, 1976.

Ralph Ruebner, J. Daniel Stewart, and Michael Mulder, all of State Appellate Defender's Office, of Elgin, for appellant.

William J. Cowlin, State's Attorney, of Woodstock (Edward N. Morris and Robert L. Janes, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE DIXON delivered the opinion of the court:

Defendant Robert McKinley was indicted, along with Frank Kostrzeski and Robert Tobel, for criminal damage to property exceeding $150. They were jointly tried in a bench trial, and all were found guilty. Defendant McKinley was sentenced to imprisonment for a term of one year to one year and one day. McKinley prosecutes this appeal on three grounds: (1) that the court erred in refusing to suppress the pretrial identification of the defendant; (2) that the court erred in refusing to suppress defendant's post-arrest statement and (3) that the State failed to prove him guilty beyond a reasonable doubt.

Evidence at trial indicated the following events took place. Joseph M. Skalas owned a house under construction at 918 Three Oaks Road in McHenry County. Between 6:30 and 7 p.m. on the evening of August 4, 1973, Joseph M. Skalas and his brother, Wayne, drove out to the house to see how the construction was progressing. When they arrived at the house, they both saw a man standing outside the house and throwing something into a wheelbarrow. Neither brother could identify what this first individual threw into the wheelbarrow. This first individual immediately left the premises.

After the Skalas brothers arrived at the property, they immediately got out of the car and ran toward the house. As Joseph Skalas went into the house, a second person ran past him. Wayne Skalas ran outside the house and attempted to tackle this second person as he ran away from the house. He was not successful; the person made his way through a barbed wire fence and Wayne Skalas decided not to pursue him any further.

Joseph Skalas proceeded into the house and noticed that copper tubing had been ripped out of a wall, several toilet and plumbing fixtures were

damaged, and a window had been damaged. While he was in the house he heard someone on the second floor of the building. He stood by the ladder leading to the second floor and shouted for the person to come down. The stairway in the house was not built yet. From the outside of the house, Wayne Skalas was yelling at the person on the second floor not to jump. This third individual, on the second floor, then proceeded to another side of the house and jumped out the window. Joseph Skalas saw the person descend to the ground from the window where he stood. He then went upstairs and observed more damage to the second floor.

Joseph Skalas went 50 to 60 feet from the house into a wooded area where his brother and the person who jumped from the window were located. At trial, Joseph Skalas identified Robert D. Tobel as the man who jumped from the second floor. Wayne Skalas also identified Robert D. Tobel as the man on the second floor.

Neither of the Skalas brothers saw any destruction of the property take place, nor did they hear anything that sounded like the breaking of plumbing fixtures, or copper tubing being ripped out of the walls during the time they were at the house that evening. However, testimony at trial did indicate that the house was in good repair when construction workers went home at 5:30 p.m. that day. Joseph Skalas stated that he paid $2,000 to repair the damage at the house.

Mrs. Lloyd Schmidt's property is located at 7314 South Rawson Bridge Road, Cary, Illinois, and borders the back end of Joseph Skalas' house under construction. The two houses are about 200 feet apart, although the view of the Skalas property from the Schmidts' is somewhat obstructed. Mrs. Schmidt testified that she was home on the day in question, working in her back yard. She did not see the workmen leave the Skalas' house that day, but assumed they left around 5:30 p.m. since she did not hear any more noise after that time. Between 6:15 and 6:30 p.m., she heard loud banging, swearing, and carrying on, but assumed a partition in the house was being torn down by workmen. She testified the swearing and banging noises were continuous until 6:50 p.m. when Mr. Skalas came over to have her call the police. The Skalas brothers testified, however, that they heard nothing unusual upon arriving at the house.

Before Mr. Skalas arrived to ask her to call the police, Mrs. Schmidt observed a boy in a white T-shirt and dark hair running toward her property but then going off in another direction. She then saw another boy running along the back of the Skalas' property. At trial she identified this person as defendant Tobel and stated that she had gone over to the woods where Wayne Skalas was, in order to give Tobel first aid. On cross-examination, Mrs. Schmidt stated that she saw no one enter or leave the Skalas house on the day in question.

Deputy Charles A. Terrill and Deputy Merrill Donovan responded to

Mrs. Schmidt's phone call to the McHenry County sheriff's department. Deputy Terrill located the injured party in the woods west of Skalas' house and made an in-court identification of defendant Tobel as the injured party he had seen on August 4, 1973. After a brief conversation with Wayne Skalas, Terrill found out that Tobel and two others had been in the house when the Skalas brothers drove up and that Tobel had jumped out of the second story window. Deputy Terrill then asked Tobel to identify himself, and he did. At this time Deputy Terrill claimed that he had not been informed of any damage to the house, so he did not read Tobel his rights, but instead asked him what he was doing at the house. Tobel said that he was a carpenter, looking around the house to see how it was constructed. Deputy Terrill then asked Tobel who he was with and Tobel responded, saying McKinley and Kostrzeski.

After questioning Tobel as to who he was with, Deputy Terrill learned of the damage in the house from Joseph Skalas. Deputy Terrill helped Tobel into the rescue ambulance and at the same time advised him that he was under arrest and read him the *Miranda* warnings. Deputy Terrill radioed the names of McKinley and Kostrzeski and McKinley's address to other units in the area. He then proceeded with the Skalas brothers in the squad car to McKinley's residence.

Sergeant John Hansen was in the area and received Deputy Terrill's message. He received a short description of McKinley and proceeded to 908 Three Oaks Road where McKinley's farm was. Sergeant Hansen saw a person resembling the description he had received and asked him his name. McKinley identified himself; and Hansen informed him he was under arrest, handcuffed him, and placed him in the squad car. Hansen testified that he advised McKinley of his rights; and defense counsel, Mr. Downs, objected to that conclusion. In response to the question of what he meant by "advised him of his rights" Hansen stated:

> "I advised him of his right to remain silent; that anything he said could be used against him in a court of law; that he had a right to have an attorney present, before any questioning; that he could stop answering any questions at any time he desired to. He was asked if he understood them, at that time, and he stated he did understand."

After this testimony the State's Attorney, Mr. Kilduff, sought to introduce a statement that McKinley allegedly made to Sergeant Hansen while on the way to Mrs. Schmidt's residence. The statement was introduced over defense counsel Downs' objection in the following manner:

> "MR. KILDUFF: Q. Did you interrogate him?
> A. No, sir, I did not.
> Q. This was right after you arrested him?

A. Yes.

Q. What happened?

A. At that time, he stated, 'I don't know what Wasso told you'—

MR. DOWNS: I object, Your Honor.

THE COURT: Why?

MR. DOWNS: Under the *Miranda* grounds.

THE COURT: Overruled.

MR. KILDUFF: Q. What did Mr. McKinley say?

A. I don't know what Wasso told you, but Bob is full of shit."

There is some discrepancy about the exact wording of this statement, on cross examination, it was referred to as "I don't know what Wasso told you, but I wasn't there, Bob is full of shit."

. Subsequently, Hansen learned that "Wasso" was the nickname of Robert D. Tobel. Further testimony by Hansen indicated that he had not yet informed McKinley of Tobel's statement or made reference to the property at 918 Three Oaks Road. Hansen, however, did inform McKinley prior to his making the statement that he was under arrest for criminal damage to property and that he was being taken for identification by two witnesses who had seen him leaving the scene of criminal damage to property.

After McKinley's statement concerning Robert Tobel, Sergeant Hansen arrived at Mrs. Schmidt's residence with McKinley in the car. She could not identify McKinley as one of the two persons she had seen leaving the Skalas property that day. Sergeant Hansen then received instructions radioed from Deputy Terrill to meet him at the McKinley property where Terrill would bring the Skalas brothers in order to make the identification. During this radio conversation, Deputy Terrill mentioned McKinley and Kostrzeski by name, and this took place while the Skalas brothers were in the police car.

When Wayne Skalas first arrived at the McKinley farm, a distance of about four blocks from the place of the offense, he observed approximately 15 people standing along a fence, and he picked out Kostrzeski as the person he tried to tackle as he ran away from the house. At this point Sgt. Hansen and McKinley emerged from behind a barn where Sgt. Hansen had taken McKinley to relieve himself. McKinley was handcuffed to Sgt. Hansen as they walked over toward Wayne Skalas and Deputy Terrill. There is some dispute about the conversation that took place then, but it appears that Sgt. Hansen asked Skalas "Is this one of them?" and Skalas replied "That is him." No other suspects were shown to Wayne Skalas. He made an in-court identification of McKinley, as the first individual that he had seen standing by the wheelbarrow. Joseph Skalas, who was riding in the car his brother was driving, could not identify McKinley. Wayne Skalas testified that when he first observed defendant,

McKinley had had on a purple shirt and wore a mustache but when he made the identification at the farm, McKinley had on a white T-shirt. Deputy Terrill also said that McKinley had on a white T-shirt at the identification, but Sergeant Hansen's testimony was that it was purple. Both officers referred to People's Exhibit 1, a "mug" shot of McKinley taken on the day in question and testified that he was clean shaven, having no mustache.

McKinley testified that he and a group of 15 to 20 friends gathered at his farm to have a party. Among these people were Tobel and Kostrzeski. The group of people went swimming in a mud hole by a cemetery in the afternoon; after they were finished swimming, McKinley led the group back to his house. Both Tobel and Kostrzeski stated that the group ran back to McKinley's property, and Tobel further testified that this was when he lagged behind the others and stopped by the house.

Both McKinley and Kostrzeski denied being at the Skalas property on August 4, 1973. McKinley testified that he did not have a mustache and that he was not wearing a purple shirt on that day. McKinley further testified that he did not make the statement concerning "Wasso" until after he was at the police station and Sgt. Hansen told him that Tobel had accused him of being involved. Tobel testified that he was swimming with the group, and that when McKinley was leading the group and everyone else was running, he (Tobel) decided to walk. When he saw the house under construction, he went over to see the type of construction. He said he jumped from the second story window and ran when he saw Skalas approach because he was scared; he had earlier been told by McKinley that people around there kept guns and shot people who came on their property. Tobel further testified that the police officer hadn't mentioned any damage to the house (and Tobel denied having damaged the property) when he asked him who he was with; and that he replied McKinley and Kostrzeski because he assumed the police officer was asking in order to notify his friends of his injury. Tobel testified that he was at the house alone; that McKinley and Kostrzeski were not with him.

Defendant McKinley first made his motion to suppress the testimony concerning the pretrial identification at the close of the State's case, even though Wayne Skalas was the fifth of the prosecution's seven witnesses. The State presented the arguments of waiver and timeliness at that time and again on appeal. However the court did not rule on the timeliness question, and disposed of the matter on its merits. Although we do not condone the procedure followed by the defense in this case, of waiting until the close of the State's case to object when all the information upon which the objection was made was known to the defense before trial, because of the court's rulings and because this was a bench rather than a jury trial, we will likewise review the issue on its merits.

■■ Defendant contends that the identification procedure was so unnecessarily suggestive and conducive to irreparable misidentification as to render testimony concerning it inadmissible, citing *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, and *People v. Blumenshine* (1969), 42 Ill. 2d 508. We disagree. The burden is on defendant to prove that the confrontation as conducted resulted in a denial of due process of law. (*People v. Johnson* (1970), 45 Ill. 2d 38.) Whether there was a denial of due process depends on the totality of the circumstances (*Stovall v. Denno.*) There was proximity of both time and place between the confrontation and the offense. The defendant's farm was four blocks from the scene of the offense. The confrontation took place within one hour of the offense. Prompt "on scene" identifications were discussed with approval in *People v. Elam* (1972), 50 Ill. 2d 214, where our supreme court said at page 218:

"In *Bates v. United States* (D.C. Cir. 1968), 405 F.2d 1104, the court at page 1106 stated: 'There is no prohibition against a viewing of a suspect alone in what is called a "one-man showup" when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy. The rationale underlying this is in some respects not unlike that which the law relies on to make an exception to the hearsay rule allowing spontaneous utterances a standing which they would not be given if uttered at a later point in time.' The court further observed that such procedure fosters the desirable objectives of fresh, accurate identifications which may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing offender while the trail is fresh.

Such confrontations have been approved specifically by this court, and do not violate the principle announced by the United States Supreme Court in *United States v. Wade*, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926; *Gilbert v. California*, 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951; and *Stovall v. Denno*, 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, all of which were cited by the defendant."

■■ We therefore find no merit in defendant's argument that a one-man show-up is inherently suggestive. The United States Supreme Court has stated that it is the likelihood of misidentification which violates a defendant's right to due process, and that

"* * * the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the

level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." (*Neil v. Biggers* (1972), 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382.)

We do not feel that the defendant's lack of a moustache and the fact that he was no longer wearing a purple shirt when he was identified, two elements of an otherwise accurate description by Skalas, is sufficient to compel a finding that these reliability factors were not met. Wayne Skalas testified that when he came upon the crime he was 20 feet away from the defendant in daylight, that his attention was drawn to the unusual sight of seeing someone throwing something into the wheelbarrow after working hours, that he was certain upon viewing McKinley that he was this person, and that the confrontation occurred within one hour of the crime. In light of these considerations, we find that the confrontation was not unnecessarily suggestive and that the court did not err in denying defendant's motion to suppress testimony of the pretrial identification.

In addition we reject defendant's contention that the *Neil v. Biggers* test employed above applies only to pre-*Stovall* identifications. Defendant relies on *Brathwaite v. Manson* (2d Cir. 1975), 527 F.2d 363, however there appears to be a difference of opinions among the circuits on this point, and the Seventh Circuit has gone the other way, finding that the *Biggers* reliability factors do apply to post-*Stovall* confrontations. (See *United States ex rel. Pierce v. Cannon* (7th Cir. 1974), 508 F.2d 197; *United States ex rel. Kirby v. Sturges* (7th Cir. 1975), 510 F.2d 397.) The Supreme Court has granted *certiorari* in *Manson v. Brathwaite*, ___ U.S. ___, 48 L. Ed. 2d 202, 96 S. Ct. 1737 (May 3, 1976), but has not yet ruled, so we will follow the rulings of the Seventh Circuit here.

■■ Defendant's second contention is that the court erred in allowing defendant's post-arrest incriminating statement into evidence. Defendant contends that the statement was a product of custodial interrogation, and because defendant was defectively informed of his *Miranda* rights the statement is inadmissible. It is clear that a person has not been fully advised of his rights if he is not told that an attorney will be hired for him if he cannot afford one. (*Miranda v. Arizona* (1966), 384 U.S. 436, 473, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) However, we find that defendant's statement was not rendered inadmissible by the defective *Miranda* warnings because the statement was not a product of custodial interrogation, the stage at which a person is entitled to be warned of his Federal constitutional rights under *Miranda v. Arizona*.

We find that the statement in this case was voluntary and spontaneous and therefore not a product of custodial interrogation. Defendant had been placed in the squad car, told he was under arrest for criminal damage to property and that he was being taken to be identified by two

witnesses. He was then given his *Miranda* rights, as noted above, defectively. The officer testified that he did not interrogate him, but that the defendant immediately said "I don't know what Wasso told you, but Bob is full of shit." Although the defendant was in custody, he made the statement spontaneously and not in response to any question put by the officer. We reject defendant's contention that the officer's statements regarding the witnesses were accusatory and invited a response by defendant. The remarks made by Officer Hansen concerning the charge and that he was being taken to be identified by the witnesses were an explanation to the defendant of the reason for his arrest. In *People v. Jenkins* (1st Dist. 1971), 131 Ill. App. 2d 49, the court found a police officer's remark upon placing defendant under arrest of "you just killed a woman back there" to be merely explanatory, and defendant's response of "that bitch needed killing" a voluntary and spontaneous statement. We likewise find McKinley's statement to have been voluntary and spontaneous.

As was the case in *In re Orr* (1967), 38 Ill. 2d 417, the issue is not the necessity of a warning prior to the questioning, but its necessity before a spontaneous declaration may be received in evidence. In consideration of that point in *Orr* the Illinois Supreme Court at page 424 quoted the following language from *Miranda*:

> " 'Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.' " (*Miranda v. Arizona* (1966), 384 U.S. 436, 478, 16 L. Ed. 2d 694, 726.)

The court held in *Orr* that a statement made in the absence of questioning is not inadmissible by virtue of the failure to give *Miranda* warnings; that *Miranda* only reaches custodial interrogations. We hold that the statement given by defendant following his arrest and not pursuant to any questioning by the police was not the product of custodial interrogation and is therefore not rendered inadmissible by the fact that defendant had not been correctly given his *Miranda* warnings prior to making the statement. We therefore find no error in the court's action in allowing the statement to go into evidence.

Defendant's final contention is that the State failed to prove beyond a

reasonable doubt that the defendant caused or participated in the destruction of property as charged. We have earlier dealt with the reliability of the witness' identification of defendant and the weight and credibility to be given this testimony is clearly a matter for the trier of fact. (*People v. Johnson* (1st Dist. 1974), 24 Ill. App. 3d 152.) We have also earlier dealt with the admissibility of defendant's incriminating and inculpatory statement.

Since none of the witnesses actually saw the damage being done to the house, the evidence against the defendants was circumstantial. As the First District recently said in *People v. Bates* (1975), 25 Ill. App. 3d 748, 751-52:

> "To support a conviction based solely on circumstantial evidence 'the facts proved must be consistent with defendant's guilt and inconsistent with any reasonable hypothesis of innocence.' (*People v. Murdock*, 48 Ill. 2d 362, 367, 270 N.E.2d 21, 24.) However, the trier of fact is not required to search out a series of potential explanations compatible with innocence and elevate them to the status of a reasonable doubt (*People v. Russell*, 17 Ill. 2d 328, 161 N.E.2d 309; *People v. Little*, 18 Ill. App. 3d 1081, 311 N.E.2d 173) nor must it 'disregard the inferences that flow naturally from the evidence before it.' *People v. Owens*, 23 Ill. 2d 534, 538, 179 N.E.2d 630; *People v. Hayes*, 4 Ill. App. 3d 997, 282 N.E.2d 777."

■■ Defendant was observed between 6:30 and 7 p.m. throwing something into a wheelbarrow in front of a vandalized house under construction which was in good repair at 5:30 p.m. When defendant was arrested four blocks from the scene a few minutes later, he said, "I don't know what Wasso [Tobel] told you, but he is full of shit" before being told that Tobel had been captured or had made any statements implicating him. As defendant correctly contends, the State must prove its entire case beyond a reasonable doubt, and we have read the case of *People v. Aldridge* (4th Dist. 1974), 20 Ill. App. 3d 1045, cited to us by defendant, in which the court found the circumstantial evidence insufficient to prove that the particular defendant(s) on trial destroyed any property. However, we find the circumstantial evidence to be more compelling and incriminating of the particular defendant on trial in the instant case than in *Aldridge*, and therefore find that the circumstantial evidence adduced here was sufficient to prove defendant guilty beyond a reasonable doubt. We therefore affirm the judgment of the trial court.

Judgment affirmed.

T. J. MORAN, P. J., and RECHENMACHER, J., concur.