UNITED STATES of America, Appellee,

v.

David N. BUBAR, Peter Betres, Ronald Betres, Albert Coffey, Anthony A. Just, and Dennis Tiche, Appellants.

UNITED STATES of America, Appellee,

v.

Michael J. TICHE, Appellant.

Nos. 415, 444, 452–56, Dockets 76–1140, 76–1161, 76–1162, 76–1163, 76–1164, 76–1204 and 76–1306.

United States Court of Appeals, Second Circuit.

Argued Dec. 13, 1976.

Decided June 30, 1977.

Certiorari Denied Oct. 3, 1977.

See 98 S.Ct. 217.

J. Daniel Sagarin, Bridgeport, Conn., for appellant Peter Betres.

Alan Neigher, Bridgeport, Conn., for appellant Ronald Betres.

Paul W. Orth, Hartford, Conn. (Hoppin, Carey & Powell, Hartford, Conn., on the brief), for appellant Bubar.

Rudolph L. Zalowitz, Hackensack, N. J., for appellant Bubar.

Andrew B. Bowman, New Haven, Conn., for appellant Coffey.

Gregory B. Craig, Middlebury, Vt., for appellant Just.

Igor I. Sikorsky, Jr., Hartford, Conn., for appellant Dennis Tiche.

William J. Quinlan, Schenectady, N. Y., for appellant Michael J. Tiche.

Peter C. Dorsey, U. S. Atty., New Haven, Conn. (Thomas P. Smith and Diana Garfield, Asst. U. S. Attys., New Haven, Conn., and Jeremiah Donovan, Michal Cannon, James Waddock and Thurl Stalnaker, Jr., Law Student Interns, on the brief), for appellee.

Before MULLIGAN, TIMBERS and VAN GRAAFEILAND, Circuit Judges.

TIMBERS, Circuit Judge:

This case involves the appeals from the criminal convictions following the explosion and fire on March 1, 1975 which destroyed a four story plant of the Sponge Rubber Products Company in Shelton, Connecticut.

Appellants David N. Bubar, Peter Betres, Ronald Betres, Albert Coffey, Anthony A. Just and Dennis Tiche appeal from judgments of conviction entered upon jury verdicts returned in the District of Connecticut between January 19 and February 3, 1976 after a trial which extended over a three month period before Jon O. Newman, *District Judge.*[1] Appellant Michael J. Tiche, as to whom the jury in the first trial was unable to agree, appeals from a judgment of conviction entered upon a jury verdict returned in the Northern District of New York on June 18, 1976 after a retrial before Henry F. Werker, *District Judge.*[2]

All appellants were found guilty of conspiring to violate the federal statute against interstate travel in aid of racketeering, 18 U.S.C. §§ 371 and 1952 (1970) (Count One), and on a substantive count of committing arson in violation of the same statute, 18 U.S.C. § 1952 (1970) (Count Two). Appellants Bubar, Peter Betres, Dennis Tiche and Michael J. Tiche also were found guilty of interstate transportation of dynamite in violation of 18 U.S.C. § 844(d) (1970) (Count Three) and of possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d) (1970) (Count Four).

Of the numerous claims of error raised on appeal, we find the following to be the principal ones: (1) Peter Betres, Ronald Betres and Coffey claim that certain in-court identifications of them should have been excluded as the products of an impermissibly suggestive photographic identification procedure, and Just raises a similar claim with respect to certain witnesses' testimony regarding out-of-court identifications of his photograph; (2) Bubar, Coffey, Just, Peter Betres and Ronald Betres claim that certain language in the prosecutor's rebuttal summation constituted commentary on their failure to testify; (3) Peter Betres and Dennis Tiche claim that there was no unregistered firearm to support their conviction for violating 26 U.S.C. § 5861(d); (4) Bubar claims that the incompetence of the counsel he selected to represent him in the district court deprived him of his Sixth Amendment right to counsel; and Coffey, Just, Dennis Tiche, Peter Betres and Ronald Betres claim that the trial of their cases should have been severed from that of Bubar because of prejudicial conduct on the part of Bubar's counsel; and (5) Michael J. Tiche claims that his indictment should have been dismissed on the ground that the delay in his retrial occasioned by the change of venue from the District of Connecticut to the Northern District of New York and the substitution of his counsel violated paragraph 7 of the District of Connecticut Plan for Prompt Disposition of Criminal Cases.

We affirm.

## I. THE ARSON

In view of the issues on appeal,[3] we summarize here the essential facts, viewed in

---

1. On March 22, 1976 Judge Newman imposed the following net effective sentences of imprisonment on these six appellants:

Bubar .........................20 years
Dennis Tiche .................15 years
Peter Betres .................15 years
Ronald Betres ...............10 years
Just ..........................10 years
Coffey ........................10 years

2. On July 6 Judge Werker sentenced Michael J. Tiche to 6 years under the Youth Corrections Act.

3. None of appellants challenges the sufficiency of the evidence to support the respective convictions. We nevertheless have reviewed carefully the evidence and are satisfied that it was more than sufficient to support the conviction

the light most favorable to the government, regarding the massive arson which destroyed the plant of the Sponge Rubber Products Company (Sponge Rubber) at Shelton on March 1, 1975. Other more detailed facts necessary to an understanding of our rulings on the legal issues raised will be stated in connection with our discussion of those issues below.

The prime mover behind the scheme was Bubar, a religious figure and psychic who was the confidante and spiritual advisor of Charles O. Moeller, the president and majority shareholder of Sponge Rubber.[4] Moeller provided Bubar with a fund of $35,000 which Bubar used to finance the destruction of the Sponge Rubber plant. Bubar's contact with the other appellants was through Peter Betres who coordinated the destruction project and to whom Bubar distributed at least $21,000.

Peter Betres' base of operations was in Pennsylvania. The project's logistics entailed procuring destructive materials, transporting them from Pennsylvania to Shelton and setting them up in the plant. Dynamite, detonating cords, detonating caps and drums of gasoline were obtained by Dennis Tiche and defendant John Shaw.[5] A truck was rented to transport these materials to Connecticut. Albert Coffey signed the rental agreement. The truck was loaded at the place of business of Dennis Tiche in Pennsylvania. It then was driven to Connecticut by defendant Donald Connors.[6] It was Peter Betres who introduced Connors to Shaw and Dennis Tiche.

On February 28, 1975, the day before the arson occurred, Shaw, Dennis Tiche and Michael J. Tiche met Peter Betres at LaGuardia Airport. There Peter Betres gave $3,000 to Dennis Tiche. Shaw and both Tiches then left New York for Connecticut. Meanwhile, Coffey, Just and Ronald Betres met in a motel room in Danbury, Connecticut.

At midday on March 1 the two groups—Shaw and the Tiches on the one hand and Coffey, Just and Ronald Betres on the other—met with Bubar at a restaurant near the Sponge Rubber plant. Thereafter Bubar secured the entry into the plant of Shaw and the Tiches, together with the explosives, by telling the plant security personnel that the men were employees of the telephone company. That night Shaw and the Tiches set up the explosives on a time fuse. Early in the evening Bubar secured the entry into the plant of Coffey, Just and Ronald Betres. This latter group of three captured the three plant employees who had remained on the premises after hours. Coffey and Just took the three employees by car to an isolated location.

With the time fuse running, Shaw, the Tiches and Ronald Betres left the plant together in the latter's car. They rendezvoused with Coffey and Just on a road north of Shelton. Coffey and Just there abandoned the employees in the car they had used to remove them from the plant. Coffey and Just joined the others in Ronald Betres' car. The six, after driving by the burning plant, drove together to New York City. From there Coffey, Just and Ronald Betres drove to Pittsburgh. Shaw and the Tiches travelled to Pittsburgh by air.

The cornerstone of the government's case was the testimony of Shaw, including his in-court identification of each appellant. Shaw's testimony was corroborated by financial records, telephone records, airline ticket records, fingerprints taken at the Danbury motel and other circumstantial evidence.

The trial in the District of Connecticut began before Judge Newman on October 6,

---

of each appellant on each count upon which he was convicted.

4. Moeller was acquitted by the jury on all counts upon which he had been indicted.

5. Shaw, who was the government's principal witness, pleaded guilty to Counts One and Two.

He was sentenced to a net effective 5 year term of imprisonment.

6. Connors was acquitted by the jury on all counts upon which he had been indicted.

1975. The presentation of evidence continued through January 6, 1976. Following arguments of counsel and the court's charge, the jury returned verdicts convicting appellants as stated above during the period from January 19 to February 3.

On February 11 the jury reported that it was unable to reach a verdict as to Michael J. Tiche on any of the counts. Judge Newman accordingly granted his motion for a mistrial and in due course ordered that his case be transferred for retrial to the Northern District of New York. The retrial began in the Northern District on June 7 before Judge Werker and was concluded on June 18 when the jury returned a verdict of guilty against Michael J. Tiche on each of Counts One through Four.

The instant consolidated appeals have been taken by Michael J. Tiche from his conviction in the Northern District of New York and by the other six appellants from their convictions in the District of Connecticut.

## II. PHOTOGRAPHIC IDENTIFICATIONS

(A) *Peter Betres, Ronald Betres and Coffey*

Peter Betres, Ronald Betres and Coffey challenge on due process grounds the in-court identifications of them by Shaw. They claim the identifications were the product of an impermissibly suggestive photographic identification procedure.

On April 10, 1975, after Shaw was taken into custody, federal agents showed him what the government describes as "a stack of between six and fifteen photos, displayed one at a time." Photographs of Peter Betres, Ronald Betres and Coffey were included. Shaw identified all three, although he expressed doubt as to the photographs of Peter Betres and Coffey.

Normally the threshold question is whether the identification procedure was impermissibly suggestive. The procedure here combined characteristics of the photographic "spread" which may pass constitutional muster if properly done, cf. *Boyd v. Henderson*, 555 F.2d 56, 59–60 (2 Cir. 1977),

and characteristics of the singly presented photograph which, absent exigent circumstances, see *Simmons v. United States*, 390 U.S. 377, 384–85 (1968), amounts to an impermissibly suggestive photographic identification procedure. E. g., *Brathwaite v. Manson*, 527 F.2d 363, 367 (2 Cir. 1975), *rev'd on other grounds, sub nom. Manson v. Brathwaite*, 432 U.S. 98 (1977); *United States ex rel. John v. Casscles*, 489 F.2d 20, 24 (2 Cir. 1973), *cert. denied*, 416 U.S. 959 (1974). If the procedure is found to have been unnecessarily suggestive, the issue becomes whether the identification possesses sufficient aspects of reliability. *Manson v. Brathwaite, supra*, 432 U.S. at 109–17.

While the indicia of suggestiveness appear to point in both directions in this case, we find it unnecessary to reach the question whether the procedure was impermissibly suggestive since Shaw did not testify on the basis of the photographic identifications themselves. *United States v. Yanishefsky*, 500 F.2d 1327 (2 Cir. 1974); *United States v. Mims*, 481 F.2d 636 (2 Cir. 1973) (per curiam). In *Brathwaite v. Manson, supra*, 527 F.2d at 367 & n. 6, we reaffirmed our rule that an in-court identification is permissible if it stems "from the original observation of the defendant rather than the tainted identification". See also *Manson v. Brathwaite, supra*, 432 U.S. at 110 n. 10. We therefore turn to an inquiry whether Shaw's in-court identifications were supported by an independent basis in memory.

Shaw had excellent opportunities to observe Ronald Betres and Coffey. He met both among the group of six in addition to himself at the restaurant at midday on March 1. Thereafter he rode to New York in the same automobile with Ronald Betres and Coffey, among others. The group stopped at a turnpike service area on the way to New York. There Shaw had an opportunity to view Coffey in the lighted parking lot. He observed Ronald Betres in the parking lot and inside the building. Once in New York, Shaw joined Ronald Betres, Coffey and the others in a tavern for parting drinks.

Shaw's opportunities to view Peter Betres were more fleeting. They first met and spoke to one another at close range for one minute out of doors on a dark night. Their only other meeting, also brief, occurred in a well-lit area at LaGuardia Airport. Shaw paid close attention on both occasions. At LaGuardia it was Shaw rather than Tiche who first recognized the approaching Betres. Shaw later described in detail the clothes Betres wore on both occasions. In light of this corroboration and on the authority of our decisions in analogous situations, *Mysholowsky v. New York*, 535 F.2d 194 (2 Cir. 1976); *United States v. Mims, supra*, we hold that Shaw's opportunities to observe Peter Betres were sufficient to have enabled him to form and retain an independent impression.

Appellants, relying on the factors for determining reliability set out in *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972), argue that Shaw's identifications were unreliable despite his opportunities to observe. They point out that six weeks elapsed between the crime and the photographic identifications; that Shaw expressed uncertainty about his identifications; and that Shaw made an incorrect estimate of Ronald Betres' height. Appellants also stress that the United States Attorney, in response to a question by Shaw, told him before he testified that the men he would be identifying would be in court and that he previously had identified them in photographs. Shaw thereafter was on the witness stand for a day and a half before the United States Attorney asked him to make the identifications.

■ Although these facts arguably might be said to support the claim that Shaw relied on mental impressions from the photographs in making the identifications, we hold that they are insufficient to rebut the inference of an independent basis for his identifications. Despite what is described as the United States Attorney's apparent orchestration of Shaw's testimony, it amounted to little more than what became self-evident once Shaw took the stand. Since the entire matter was fully developed on cross-examination of Shaw by appellants' counsel, the latter had ample opportunity to make use of it in attacking Shaw's credibility and in challenging the weight of the identification evidence. Significantly, Shaw was sufficiently certain of his identifications to withstand extensive cross-examination.[7] Moreover, Judge Newman's finding of an independent basis for the identifications is entitled to great weight. *United States ex rel. Pella v. Reid*, 527 F.2d 380, 384 (2 Cir. 1975).

■ We hold that Shaw's identifications had an independent basis in memory sufficient to support his in-court identifications without reliance on the intervening photographs. We are satisfied that the identification was reliable, *Manson v. Brathwaite, supra*, 432 U.S. at 114–117, and that there was no substantial likelihood of irreparable misidentification. *Simmons v. United States, supra*, 390 U.S. at 384.

(B) *Just*

Several employees of the Sponge Rubber plant and the Danbury motel testified that they identified Just on the basis of a photograph of him included in a six-photograph spread displayed to them by federal agents. Just claims that, because the spread was impermissibly suggestive and the identifications unreliable, the identification testimony should have been excluded. *Manson v. Brathwaite, supra*, 432 U.S. at 104–07, 111–114; *Simmons v. United States, supra*, 390 U.S. at 384.

■ Just's claim of unnecessary suggestiveness relates only to the qualities of the photographs, not to the manner of their presentation. He argues that the focus and contrasts were sharper in his photograph; that a narrow strip of light not in the other photographs ran across the field above his head; and that his hair was longer and darker, his moustache darker and bushier, than those of the other individuals depicted.

---

7. The only slip of memory that surfaced with regard to the identifications while Shaw was on the stand involved his uncertainty as to whether Ronald Betres had a Van Dyke beard.

We hold that these differences did not render the spread suggestive in the first instance, much less impermissibly so within the meaning of *Simmons*. The due process clause does not require law enforcement officers to scour about for a selection of photographs so similar in their subject matter and composition as to make subconscious influences on witnesses an objective impossibility. Cf. *United States v. Harrington*, 490 F.2d 487, 494–95 (2 Cir. 1973). In light of this holding, we need not reach the question of reliability.

### III. PROSECUTOR'S REBUTTAL SUMMATION

As we have had occasion to note, "[w]e suppose it is inevitable, in a trial of this complexity and length and especially with extensive summations . . . that claims of prejudice with respect to the prosecutor's summation would be raised." *United States v. Rubinson*, 543 F.2d 951, 964 (2 Cir.), *cert. denied sub nom. Reynolds v. United States*, 429 U.S. 850 (1976). Here, as there, such claims have been raised.

Bubar, Coffey, Just, Peter Betres and Ronald Betres claim that the United States Attorney's repeated mention in his rebuttal summation of their failure to produce evidence to rebut elements of the government's case amounted to commentary on their failure to testify and as such violated their Fifth Amendment privileges against self-incrimination. Specifically, the statements challenged all were directed either to the defendants' failure to explain some piece of evidence (a telephone call, a finger-print in the Danbury motel, or Coffey's signature under a false name in the motel registry) or to their failure to produce evidence substantiating the innocent explanations which they had argued to the jury.[8]

We hold that in neither category did the substance of the prosecutor's comments violate appellant's constitutional rights. The prosecutor is entitled to comment on a defendant's failure to call witnesses to contradict the factual character of the government's case, *United States v. Dioguardi*, 492 F.2d 70, 81–82 (2 Cir.), *cert. denied*, 419 U.S. 873 (1974), as well as his failure to support his own factual theories with witnesses. *United States v. Rodriguez*, 556 F.2d 638, 641 (2 Cir. 1977); *United States v. Lipton*, 467 F.2d 1161, 1168 (2 Cir. 1972), *cert. denied*, 410 U.S. 927 (1973). A constitutional violation occurs only if either the defendant alone has the information to contradict the government evidence referred to or the jury "naturally and necessarily" would interpret the summation as a comment on the failure of the accused to testify. *United States ex rel. Leak v. Follette*, 418 F.2d 1266 (2 Cir. 1969), *cert. denied*, 397 U.S. 1050 (1970).

Such was not the case here. None of the United States Attorney's remarks related to evidence rebuttable solely by a defendant. A valid, corroborated alibi defense could have explained the fingerprints, the telephone calls and Coffey's false signature. Appellants' claims really go to the prosecutor's phrasing rather than the substance of his remarks. On several occasions he referred to a defendant's failure to "explain" or "refute" certain evidence.[9] View-

---

**8.** Bubar attacks the prosecutor's comment that he failed to refute the government's case.

Coffey attacks the prosecutor's comments on his failure to refute the fingerprint at the Danbury motel and to explain his signature under a false name in the Danbury motel registry.

Just claims prejudice from the prosecutor's comments against the other appellants and defendant Connors.

Peter Betres attacks the prosecutor's comments on his failure to substantiate his claim that he received money from Bubar in connection with a sale of printing presses from himself to Bubar, and his claim that he took a certain flight from Kennedy Airport on the night of the crime.

Ronald Betres attacks the prosecutor's comments that he failed to explain a telephone call from the New Jersey Turnpike to his Pennsylvania residence made in the early morning of March 2, and that he failed to ask questions of the government's fingerprint expert.

**9.** For example, the prosecutor stated: "Ronald Betres has in no way explained the telephone call made from New Jersey the early morning hours collect to his own phone in Pennsylvania."

ing such remarks in the context of the rebuttal summation as a whole, we do not believe that this ambiguous form of expression "naturally and necessarily" would be interpreted by the jury as a comment on a defendant's failure to testify. The thrust of the prosecutor's rebuttal summation was directed at the prior arguments of defense counsel. We believe that the jury so understood the remarks in question. Moreover any conceivable misunderstanding on the part of the jury was nipped in the bud by Judge Newman's emphatic curative instructions—given first sua sponte at the end of the prosecutor's rebuttal summation and again after a recess in a formulation submitted by Peter Betres' counsel.[10] *United States v. Lipton, supra,* 467 F.2d at 1169; *United States v. Nasta,* 398 F.2d 283, 285 (2 Cir. 1968).

We hold that appellants were not prejudiced by the prosecutor's rebuttal summation.

## IV. NATIONAL FIREARMS ACT VIOLATION

 Bubar, Peter Betres, Dennis Tiche and Michael J. Tiche were convicted under Count Four for possession of an unregister-

**10.** The latter instruction included the following: "[T]o whatever extent the argument of government counsel called upon any defendant to testify or to explain away any evidence, to whatever extent that may have occurred, such argument was improper, uncalled for and illegal."

**11.** Provisions of the National Firearms Act, 26 U.S.C. §§ 5801 et seq. (1970), will be referred to in this part of the opinion by section number only.
§ 5861(d) in relevant part provides:
"§ 5861. *Prohibited acts.*
It shall be unlawful for any person—
\* \* \*
(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record . . . . "

**12.** § 5845(a)(8) in relevant part provides:
"§ 5845. *Definitions.*
For the purpose of this chapter—
(a) *Firearm.*
The term 'firearm' means . . . (8) a destructive device. . . . "

**13.** § 5845(f) in relevant part provides:

ed firearm in violation of the National Firearms Act, 26 U.S.C. § 5861(d) (1970).[11] A "firearm" is defined in § 5845(a)(8)[12] to mean a "destructive device". A "destructive device" in turn is defined in § 5845 (f)[13] to mean "(1) any explosive, incendiary . . . . (A) bomb . . . or (F) similar device; . . . and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled . . . . " Peter Betres and Dennis Tiche contend that the combination of dynamite, detonating cord, detonating caps and drums of gasoline used to commit the arson at Shelton did not constitute a "destructive device" within the meaning of § 5845(f). We disagree.

In *United States v. Cruz,* 492 F.2d 217, 219 (2 Cir.), *cert. denied,* 417 U.S. 935 (1974), we held that a completed Molotov cocktail was an incendiary bomb or similar device within the meaning of § 5845(f), relying on the "ordinary meaning" of the statute and its legislative history:

"[T]he legislative history of the Firearms Act indicates that it requires registration of *objectively destructive devices,* devices

"§ 5845. *Definitions.*
For the purpose of this chapter—
\* \* \*
(f) *Destructive device.*
The term 'destructive device' means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary or his delegate finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled . . . . "

inherently prone to abuse and for which there are *no legitimate industrial uses.*" *Id.* (emphasis added).

We likewise hold in the instant case that the materials utilized, once placed on the Shelton premises—with timers connected to detonating caps, caps connected to a fuse, a fuse connected to sticks of dynamite and the dynamite placed under barrels of gasoline—similarly constituted an objectively destructive device which had no legitimate industrial use. We recognize that a Molotov cocktail, although homemade, is portable, adaptable, and perhaps even saleable. The apparatus in this case, in contrast, was designed for a single purpose and became a "device" within the meaning of § 5845(f), as opposed to an aggregation of parts not covered by the statute, see *United States v. Posnjak*, 457 F.2d 1110 (2 Cir. 1972), only upon being set up in the Shelton plant. But under our construction of § 5845(f) in *Cruz* this distinction is not determinative. Once the components were connected, in however crude a fashion, to form a *new entity* with destructive capabilities of its own and without a legitimate purpose, an incendiary "device" within the meaning of § 5845(f) came into being. Cf. *United States v. Tankersley*, 492 F.2d 962 (7 Cir. 1974); *United States v. Peterson*, 475 F.2d 806, 810 (9 Cir.), *cert. denied*, 414 U.S. 846 (1973); *United States v. Davis*, 313 F.Supp. 710, 714 (D.Conn.1970).

*United States v. Posnjak, supra,* is not to the contrary. There we held that the possession of dynamite, a fuse and caps, taken alone, did not amount to possession of a "destructive device". Since those materials were susceptible of legitimate use and since the language of § 5845(f) contemplated the existence or potential existence of a device which would meet objectively the criteria of the statute independent of the user's intent, the materials there involved did not constitute a "destructive device" within the meaning of § 5845(f). While we recognized in *Posnjak* that Congress, in enacting the National Firearms Act, was concerned mainly with "objectively identifiable weapons of war and 'gangster-type weapons' ", 457 F.2d at 1116, we explicitly noted that a homemade incendiary product also might be embraced within the statute's definition. *Id.* at 1119 & n. 10, 1120.

We sustain the convictions of Bubar, Peter Betres, Dennis Tiche and Michael J. Tiche for possession of an unregistered firearm in violation of the National Firearms Act.

## V. BUBAR'S COUNSEL AND CO–DEFENDANTS' SEVERANCE CLAIMS

Bubar's court-appointed counsel on appeal claims that one of the two attorneys who represented him in the Connecticut District Court was so incompetent that he was denied his Sixth Amendment right to effective assistance of counsel.[14] Bubar's five co-defendants in the district court—Coffey, Just, Dennis Tiche, Peter Betres and Ronald Betres—claim that the district court erred in denying their motions for a severance from the trial of Bubar in view of the prejudice to the co-defendants caused by the behavior of Bubar's counsel. For the reasons below, we reject both claims.

### (A) *Standard For Determining Ineffective Assistance Of Counsel*

██ The stringent standard in this Circuit for nearly three decades for determining lack of effective assistance of counsel is that enunciated in *United States v. Wight*, 176 F.2d 376, 379 (2 Cir. 1949) (Smith, *J.*),

---

**14.** Bubar was represented by two attorneys in the district court: Rudolph L. Zalowitz, Esq. of the New Jersey bar, who was retained by Bubar on March 3, 1975, two days after the fire, and who represented him throughout all proceedings in the district court; and Richard T. Meehan, Esq. of the Connecticut bar, who participated as court-appointed counsel with Zalowitz in representing Bubar from sometime in July 1975 until his withdrawal on November 11, after more than a month of trial, at the direction of Bubar and with the approval of Judge Newman.

Bubar has been represented on appeal before us chiefly by court-appointed counsel, Paul W. Orth, Esq. of the Connecticut bar. Throughout the appeal, moreover, Bubar has continued to authorize Zalowitz to represent him and we have received a separate brief from Zalowitz on behalf of Bubar.

*cert. denied*, 338 U.S. 950 (1950), and recently reaffirmed in *Rickenbacker v. Warden*, 550 F.2d 62, 65–66 (2 Cir. 1976) (Smith, *J.*), and authorities cited therein. *Id.* at 65. The *Wight-Rickenbacker* standard is as follows:

"[U]nless the purported representation by counsel was such as to make the trial a farce and a mockery of justice, mere allegations of incompetency or inefficiency of counsel will not ordinarily suffice . . .
A lack of effective assistance of counsel must be of such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice. . . ." 176 F.2d at 379 (*Wight*); 550 F.2d at 65 (*Rickenbacker*).

This standard has been repeatedly reaffirmed and uniformly adhered to by our Court. See, e. g., *United States v. Taylor*, 562 F.2d 1345, 1360–61 (2 Cir.), *cert. denied sub nom. Ramsey v. United States*, 46 U.S. L.W. 3217 (U.S. Oct. 4, 1977); *United States ex rel. Lunz v. Henderson*, 533 F.2d 1322, 1327 (2 Cir.), *cert. denied*, 429 U.S. 849 (1976); *United States v. Yanishefsky*, 500 F.2d 1327, 1333–34 & n. 2 (2 Cir. 1974); *United States ex rel. Marcelin v. Mancusi*, 462 F.2d 36, 42, and authorities cited at 42 (2 Cir. 1972), *cert. denied*, 410 U.S. 917 (1973).

We continue emphatically to adhere to this standard.

■ In view of our holding below that Bubar intelligently exercised his constitutional right to be represented by counsel of his own choice, it is not necessary for us to reach the question whether Zalowitz's representation of Bubar conformed to this Circuit's standard for determining ineffective assistance of counsel or the related question whether such representation, even if ineffective, was so prejudicial as to deprive Bubar of substantial rights. See *United States ex rel. Testamark v. Vincent*, 496 F.2d 641, 643–44 (2 Cir. 1974), *cert. denied*, 421 U.S. 951 (1975). We do note in passing, however, that, despite the overwhelming strength of the government's case against Bubar,[15] Zalowitz did effectively cross-examine a number of the government witnesses, including the government's principal witness, Shaw; he sought to establish as his defense that Bubar was a saint who could not possibly have done wrong[16] and at the same time he tried to show that Shaw and the government were in league against him—*God v. Mammon*; and, even though this may be regarded as an odd posture for a criminal defense today,[17] some indication of its effectiveness is that it kept the jury out deliberating Bubar's fate for three days. Under our *Wight* standard, "[t]he proof of the efficiency of . . . assistance [of counsel] lies in the character of the resultant proceedings. . . ." 176 F.2d at 379.

**15.** In evaluating a claim of ineffective assistance of counsel, our Court usually has started by examining the strength of the prosecution's case. *United States ex rel. Marcelin v. Mancusi, supra*, 462 F.2d at 43–44; *United States ex rel. Crispin v. Mancusi*, 448 F.2d 233, 234 (2 Cir.), *cert. denied*, 404 U.S. 967 (1971); *United States v. Katz*, 425 F.2d 928, 930 (2 Cir. 1970); *United States v. Garguilo*, 324 F.2d 795, 796 (2 Cir. 1963).

It would be difficult to conceive of a more overwhelming case of guilt than that established by the government against Bubar here.

**16.** For example, Zalowitz argued to the jury in summation:

"[W]hat does [Reverend Bubar] personify, except godliness and one other thing: naivete? And if naivete is a crime, then I wonder how many of us would not be guilty of that crime? . . . Reverend Bubar has gone forth all of his lifetime to do nothing but help others, not to injure others. . . ."

**17.** Judge Friendly's characteristically perceptive analysis of the dilemma confronting counsel such as Bubar's here was well summarized in *Katz, supra*, 425 F.2d at 930:

"When, as here, the prosecution has an overwhelming case based on documents and the testimony of disinterested witnesses, there is not too much the best defense attorney can do. If he simply puts the prosecution to its proof and argues its burden to convince the jury beyond a reasonable doubt, the defendant may think him lacking in aggressiveness, and surely will if conviction occurs. If he decides to flail around and raise a considerable amount of dust, with the inevitable risk that some may settle on his client, the defendant will blame him if the tactic fails, although in the rare event of success the client will rank him with leaders of the bar who have used such methods in some celebrated trials of the past."

**(B)** *Bubar's Decision To Assert His Right To Be Represented By Counsel Of His Own Choice*

We turn next to what we regard as the decisive issue on Bubar's representation by counsel claim: whether he knowingly and intelligently exercised his constitutional right to be represented by counsel of his own choice.[18] We hold that he did.

The record before us demonstrates with striking clarity that Bubar selected Zalowitz as his counsel because he knew him and had compelling reasons for entrusting his defense to him; that after more than a month of trial, during which he was represented by two lawyers, he deliberately rejected Meehan, his court-appointed lawyer, and chose to continue to have Zalowitz represent him, despite Judge Newman's repeated statements to Bubar that Meehan was the more effective lawyer; on at least three occasions after Meehan's withdrawal Judge Newman reminded Bubar of Meehan's continued availability, since he had been permitted to withdraw only on the condition that he would return if Bubar needed him; and on December 2, 1975 Bubar bluntly informed Judge Newman, "I wish only Mr. Zalowitz, and I have no desire for any other attorney." Bubar adhered consistently to that position throughout proceedings in the district court and, for aught that appears in the record, still does, despite the able presentation made to us by his court-appointed appellate counsel.

Backing up for a moment, Bubar had known Zalowitz long before the Shelton fire. He had been represented by him in civil matters. Two days after the fire, Bubar retained Zalowitz to represent him in the instant case. And from the outset to the present date, one pervasive fact explains Bubar's continued insistence upon being represented by Zalowitz: he is an adherent of Bubar's religious teachings. Their relationship as teacher and follower strongly colored all aspects of Zalowitz's defense. Indeed, acting as much as follower as attorney, Zalowitz made it the mainstay of his defense to present Bubar as a religious innocent whose guilt was unthinkable.

Although Zalowitz took the lead as Bubar's counsel at the trial, Meehan, who had been appointed as co-counsel in July, participated actively in Bubar's defense until his withdrawal in November. The circumstances which lead to Meehan's withdrawal are significant in focusing upon Bubar's knowledgeable exercise of his right to be represented by counsel of his choice. Meehan had concluded that the only plausible defense for Bubar was an insanity defense. He requested Bubar to submit to a psychiatric examination. Bubar consented. Based on the examining doctors' report, Meehan concluded that a "valid psychiatric defense could be presented." *But Bubar himself expressly refused to permit such a defense to be presented on his behalf.* It was this decision by Bubar that caused Meehan to withdraw as counsel, with Judge Newman's permission. In refusing to permit Meehan to proceed with an insanity defense, Bubar chose instead the "defense of God" which Zalowitz provided.

This is a case, therefore, not only of a defendant's exercise of his right to be represented by counsel of his choice, but a case where that right was exercised by *choosing between two attorneys*, the respective capabilities of whom Bubar was fully aware at the time of his choice. When Judge Newman asked Bubar whether he objected to Meehan's withdrawal, he answered, "No."

---

**18.** The issue alternatively might be cast as one of waiver. We prefer, however, Judge Feinberg's perceptive observation in *United States ex rel. Konigsberg v. Vincent*, 526 F.2d 131, 133–34 (2 Cir. 1975), *cert. denied*, 426 U.S. 937 (1976), that "[a]t least . . . where [a defendant] was under no pressure to forego the assistance of counsel" and "where [he was] vehemently asserting his right of self-representation" such a case "is not truly a case of waiver of a constitutional right; it is a decision to assert one constitutional right instead of another." See *United States ex rel. Martinez v. Thomas*, 526 F.2d 750, 756 n. 8 (2 Cir. 1975).

A fortiori, as we hold below, if a defendant may assert his constitutional right to *self-representation*, surely as in the instant case he may assert his constitutional right to be represented by *counsel of his own choice*, provided he does so knowingly and intelligently.

He explicitly opted for Zalowitz. And the record demonstrates that he exercised his choice with full knowledge, not only of Meehan's ability as a trial lawyer, but of whatever deficiencies may be ascribed to Zalowitz as a trial lawyer. The trial had been under way for a month. Both lawyers had actively participated in Bubar's defense. Zalowitz had demonstrated everything upon which court-appointed counsel on appeal rests his present Sixth Amendment claim. The basis upon which Bubar exercised his choice between Zalowitz and Meehan hardly could have been more plain. Meehan offered conventional trial strategy and courtroom conduct. Zalowitz, the follower, offered a "defense of God". Bubar, who had submitted to a comprehensive psychiatric examination at Meehan's behest, took his time reaching the decision whether to permit an insanity defense to be presented and in reaching the related decision whether to permit Meehan to continue as his counsel. Bubar had demonstrated his knowledge of the value of counsel by contacting Zalowitz promptly after the fire. Any dearth of experience with the criminal justice system which Bubar might have had at the time of the fire was no longer a factor by November 11. Moreover, Bubar was not irrevocably bound to Zalowitz even after November 11. Judge Newman repeatedly thereafter reminded Bubar of Meehan's continued availability. Any of Zalowitz's shortcomings which conceivably were not apparent to Bubar at the time of his November 11 decision to permit Meehan to withdraw surely were fully known by December 2 when Bubar unequivocally told Judge Newman that he wanted Zalowitz—and no one else—as his attorney. In short, this is not a case in which events combined to attach a defendant to an ineffective attorney, thus leaving him with neither the means to discern his attorney's deficiency nor the opportunity to terminate his attorney's employment.

Finally, there is not the slightest suggestion that Bubar was not competent to stand trial, including the assertion of his right to be represented by counsel of his own choice. See *Pate v. Robinson,* 383 U.S. 375 (1966);

*United States ex rel. Roth v. Zelker,* 455 F.2d 1105, 1108 (2 Cir.), *cert. denied,* 408 U.S. 927 (1972). Court-appointed counsel on appeal expressly concedes that Bubar was competent to stand trial. There is nothing in the record that indicates Judge Newman thought otherwise. Bubar had no past history of psychiatric treatment. Meehan, whose opinion and actions are highly significant and probative in this matter, *United States ex rel. Roth v. Zelker, supra,* 455 F.2d at 1108 & n. 3, in the course of his conscientious representation of Bubar did not attempt to remove the decision from Bubar's hands. Meehan reported that Bubar did suffer from religious delusions. But in light of Bubar's equivocal conduct—his acquiescence in Meehan's participation as co-counsel and consideration of the possible insanity defense offered by Meehan—it cannot be said that his religious delusions prevented him from understanding the nature and consequences of the decision he made in insisting that Zalowitz, and no one other than Zalowitz, should represent him as counsel.

What the Supreme Court said in *Faretta v. California,* 422 U.S. 806 (1975), in upholding a defendant's constitutional right to conduct his own defense, strikes us as applicable a fortiori to a defendant's right, as here, to choose between counsel, provided he does so knowingly and intelligently:

"[W]hen a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. . . . This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative. An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction." 422 U.S. at 820–21.

Under all the circumstances, we believe that the record in this case overwhelmingly demonstrates that Bubar knowingly and intelligently exercised his constitutional right to be represented by counsel of his own choice.

(C) *Claim Of Prejudice By Bubar's Co-De-fendants*

Coffey, Just, Dennis Tiche, Peter Betres and Ronald Betres claim that the district court erred in denying their motions for a severance of the trial of their cases from that of Bubar. They argue that Zalowitz's conduct distracted the jury's attention from their cases and made the jury so impatient and resentful that it became skeptical of their claims.

■ In order to prevail, the burden is on appellants to establish prejudice. *United States v. Finkelstein,* 526 F.2d 517, 525 (2 Cir. 1975), *cert. denied,* 425 U.S. 960 (1976). Under *United States v. Corr,* 543 F.2d 1042, 1052 (2 Cir. 1976), they must demonstrate that the prejudice was more than that they might have had a better chance for acquittal at a separate trial.

■ The grant or denial of a severance is a matter clearly within the discretion of the trial judge. *United States v. Jenkins,* 496 F.2d 57, 67–68 (2 Cir. 1974), *cert. denied,* 420 U.S. 925 (1975). Our careful examination of the voluminous trial transcript in this case satisfies us that Judge Newman not only did not abuse his discretion in denying the motions for severance but that he exercised commendably sound discretion in doing so and thereafter in his conduct of the trial.

First, Judge Newman gave the jury appropriate cautionary instructions. Second, we find no basis in the record for holding that Zalowitz's conduct necessarily caused juror animus against Bubar's co-defendants; in view of their attorneys' actions in keeping themselves separate from Zalowitz, we believe that an inference of juror sympathy is equally reasonable. And third, during the course of this lengthy trial, each of these appellants received ample opportunity to present his claims to the jury unobstructed by any conduct on the part of Zalowitz. Any contrary inference is effectively rebutted by the care with which the jury conducted its deliberations which extended over a period of more than a month. Each defendant was given individual consideration. As to Coffey and Just, the jury was unable to agree on two of the four counts; it acquitted Ronald Betres on one count; it acquitted Moeller and Connors on all counts upon which they were indicted; and it was unable to agree on a verdict as to Michael J. Tiche. Hence the spillover argument is not persuasive.

We hold that these appellants have failed to sustain their burden of showing that they were prejudiced by the denial of their severance motions. *United States v. Barrera,* 486 F.2d 333, 339 (2 Cir. 1973), *cert. denied,* 416 U.S. 940 (1974); *United States v. Calabro,* 467 F.2d 973, 986–87 (2 Cir. 1972), *cert. denied,* 410 U.S. 926 (1973).

## VI. RETRIAL OF MICHAEL J. TICHE

After the jury in the first trial reported that it was unable to agree upon a verdict as to Michael J. Tiche, Judge Newman granted his motion for a mistrial on February 11, 1976. In due course the case was transferred on April 13 to the Northern District of New York for a retrial which began on June 7 before Judge Werker and a jury. Following the jury's return of a verdict on June 18 convicting him on the four counts referred to above, Tiche was sentenced on July 6 to a term of 6 years under the Youth Corrections Act.

■ Tiche's chief claim on appeal [19] is that Judge Werker in his decision of May 28, 1976 erred in denying Tiche's motion to dismiss the indictment prior to the commencement of his second trial. In short, he claims that failure to commence the second trial within 60 days of the declaration of the mistrial in the first trial violated paragraph 7 of the District of Connecticut Plan

---

19. He also claims that Judge Werker should have asked the jury in the second trial, after it reported that it was unable to agree, regarding the scope of its disagreement and whether further deliberations might result in an agreement before permitting it to resume deliberations.

We find no merit whatever in this claim. The handling of the jury under such circumstances was well within the trial judge's discretion which was exercised here with commendable care and fairness.

for Prompt Disposition of Criminal Cases.[20] For the reasons below, we hold that Judge Werker did not err in denying the motion to dismiss the indictment. We affirm Tiche's conviction.

## (A) Causes of the Delay

When Judge Newman granted Tiche's motion for a mistrial on February 11, he specifically noted and directed the government's attention to the 60 day limitation period. We find that the ensuing events reflect an intent to comply on the part of the district court and the government.

On March 4 the case was reassigned to Judge Zampano for trial. On March 11 Tiche was given until March 26 to file motions. On March 15 the government filed its Notice of Readiness.

Backing up for a moment, on February 19 Tiche's counsel at the first trial, Thomas D. Clifford, Esq. of the Connecticut bar moved to be relieved of his appointment under the Criminal Justice Act. On March 24, however, Mr. Clifford moved for a change of venue in view of the extensive publicity in the District of Connecticut. At the hearing on the change of venue motion, the government did not oppose the motion but pointed out that, in view of the appointment of new counsel for Tiche who would require additional time for trial prepara-

tion, "the retrial may not be begun within the required sixty-day period." At this hearing, Mr. Clifford, who had moved to be relieved as Tiche's counsel, declined to waive any of his client's speedy trial rights. On March 31 Judge Newman relieved Mr. Clifford and ordered the case transferred to the Northern District of New York for retrial.

The indictment was filed in the Northern District on April 13 (61 days after the declaration of the mistrial in the first trial). On April 14 new counsel, William J. Quinlan, Esq. of Schenectady was assigned to represent Tiche. On April 19 Mr. Quinlan informed Judge Werker[21] that the voluminous materials in the case would require a delay to allow preparation for retrial.[22] He requested and was granted until May 17 to make any motions. Mr. Quinlan filed his motions on May 12. They were argued on May 17. Among the motions filed and argued was the motion to dismiss the indictment for failure to commence the retrial within 60 days of the declaration of the mistrial. On May 17, however, Mr. Quinlan requested and was granted a continuance of the trial to June 7 in the event his motion to dismiss the indictment should be denied.

On appeal Tiche attacks the "leisurely timetable" of the District of Connecticut. We fail to see how responsibility for the

**20.** Paragraph 7 of the Connecticut Plan which was adopted pursuant to Fed.R.Crim.P. 50(b) by the Connecticut District Judges effective September 29, 1975 to comply with the interim requirements of the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161–74 (Supp. V, 1975), provides as follows:

"7. Retrial

Where a new trial has been ordered by the District Court or a trial or a new trial has been ordered by an appellate court, it shall commence at the earliest practicable time, but in any event, not later than 60 days after the finality of such order. If the defendant is to be retried following an appeal or collateral attack, the court trying the case may extend such period for a total not to exceed 180 days from the date on which the order occasioning the retrial becomes final, where unavailability of witnesses or other factors resulting from passage of time shall make trial within 60 days impractical."

It is not necessary for us to decide whether the District of Connecticut Plan or the Northern District of New York Plan applies to the delay here in question. Since the indictment which Tiche moved to dismiss, although returned in Connecticut, was transferred to the Northern District of New York for retrial and it was there that he made his motion to dismiss, it could be argued that the Northern District of New York Plan should apply. Cf. Restatement (Second) of Conflict of Laws §§ 122, 142 (1971). But since the relevant provisions (paragraph 7) of both Plans were identical, a choice of law question does not arise.

**21.** Judge Werker was not officially designated to hear the case until April 22, although he had been informally notified of his prospective designation on April 14.

**22.** The record of the first trial, which had not yet been transcribed, was estimated to consist of 13,000 pages, plus numerous exhibits and Jencks Act material.

expiration of the 60 day period can be attributed to either the district court or the government. Even if there had been more expeditious treatment of Tiche's motions by all hands, in the realistic world of the trial court, to have anticipated the change of Tiche's counsel, the granting of the motion for a transfer and the scheduling of motions by his new counsel—all within a period of 60 days from February 11—would have required a district court equipped with the power of crystal ball gazing.

### (B) *Application of Paragraph 7*

Tiche's argument is deceptively simple and straightforward. He says that the 60 day limitation for the commencement of a new trial provided for in the first sentence of paragraph 7 is clear and not subject to any exceptions. He points to the excluded periods in paragraph 6, such as the general provision for "delay occasioned by exceptional circumstances", but notes that these exceptions apply only to the time limitations for the initial trial provided for in paragraph 5. From this he draws the inference that the 60 day limitation in paragraph 7 was intended as an absolute bar—not to be relaxed even to permit a substitution of counsel or a change of venue at the request of a defendant or his counsel in connection with a retrial. We disagree.

We reject out of hand Tiche's argument that certain of our prior decisions with respect to delayed retrials under Rule 50(b) plans compel us to accept his construction of paragraph 7. *United States v. Yagid,* 528 F.2d 962 (2 Cir. 1976); *United States v. Roemer,* 514 F.2d 1377 (2 Cir. 1975); *United States v. Drummond,* 511 F.2d 1049 (2 Cir.), *cert. denied,* 423 U.S. 844 (1975). These cases are readily distinguishable. They were concerned with the applicability to administrative delays caused by the courts and the prosecutors of the "good cause" escape provision in earlier Rule 50(b) plans. The delay in question here would qualify for such a "good cause" exception even under the increasingly exacting standard established by those cases. In our view, they provide little guidance on the question of interpretation presented here.

Our more recent decision in *United States v. Didier,* 542 F.2d 1182 (2 Cir. 1976), although in one respect closer in point, in essence falls into the same category as the three cases referred to above. Paragraph 7 of the revised Southern District Plan, which is identical to paragraph 7 of the District of Connecticut Plan, went into effect during the period of delay which preceded Didier's retrial. In applying the 60 day limitation period there, we stated:

> "Further delay was also prohibited by the [revised Plan]. . . . This Plan eliminated extensions 'for good cause' in retrials after mistrial and reduced the period for retrial to 60 days. . . . Here the retrial did not take place for more than 180 days after the revised Plan went into effect." 542 F.2d at 1188.

Obviously this application of paragraph 7 of the Southern District Plan to significantly different facts cannot be taken as a construction of the "in any event, not later than 60 days" clause so as to be conclusive on the facts presently before us. *Didier* was a case "in which the government sought much of the delay for tactical purposes and the district court failed to insist that deadlines be met. . . . " *Id.* at 1189. The question raised here by a delay resulting from measures taken to protect a defendant's rights was not involved in *Didier.* See also *United States v. Amendola,* 558 F.2d 1043, 1045 (2 Cir. 1977).

Paragraph 7 of the district court plans superseded a 90 day retrial provision which had a "good cause" escape hatch. Drafted with an obvious eye to the 60 day retrial provision of the Speedy Trial Act, 18 U.S.C. § 3161(e) (Supp. V, 1975), paragraph 7 reflects the view that as a general matter retrial after mistrial is a situation where delays at the behest of the court and of the government are least excusable. The court and the government, having been ready for trial in the immediate past, are presumed to be in a position to commence a retrial within 60 days.

It requires but a moment's reflection, however, to recognize that there are certain

situations where, to apply the 60 day limitation provision of paragraph 7 as an absolute bar, would result in a gross miscarriage of justice—most assuredly contrary to the intent of the drafters of the provision. For example, the 60 day period could run out because a defendant became sick or had fled the jurisdiction. Under the literal reading of paragraph 7 urged by Tiche, such a defendant would be rewarded by dismissal of the indictment. In our view, an exception to the 60 day limitation period for acts of God and misconduct on the part of a defendant clearly is a necessary implication. That being so, we see no justification for limiting the implied exception to those situations. Necessity of a different but equally compelling character arises when the district court is called upon to protect a defendant's rights. It makes no sense in terms of the speedy trial interests of either a defendant or the public to construe paragraph 7 so as to hobble the district court with a Hobson's choice whenever a defendant makes a proper request for a delay. Such a result could not have been intended. Cf. 18 U.S.C. § 3161(e) and (h) (Supp. V, 1975).

These considerations lead us to hold that paragraph 7 should be construed to permit an exception to cover the circumstances of the instant case. We exclude from the retrial limitation period the entire time from March 24 (when Tiche moved for a change of venue) to June 7 (the date to which Tiche moved for a continuance). This is to allow for the dual purpose of accomplishing the change of venue and the trial preparation by Tiche's new counsel.

Our conclusion in this respect is fortified by the revised Plans for Prompt Disposition of Criminal Cases enacted pursuant to the Speedy Trial Act which became effective in both the District of Connecticut and the Northern District of New York on July 1, 1976. These Plans, which go further than the 1975 revised Plans toward compliance with the *pretrial* requirements of the Speedy Trial Act, provide in paragraphs 5 and 10 that "the periods of delay set forth in 18 U.S.C. § 3161(h) shall be excluded" in computing the 60 day period for *retrials.* Section 3161(h) of the Speedy Trial Act provides for certain exclusions from the time limitations of the Act. Among them are exclusions which would have been applicable here—e.g., for "delay resulting from proceedings relating to transfer from other districts", 18 U.S.C. § 3161(h)(1)(F); for delay attributable to the consideration of pretrial motions, 18 U.S.C. § 3161(h)(1)(E) and (G); and for delay resulting from a continuance granted at the defendant's request. 18 U.S.C. § 3161(h)(8)(A).

The incorporation in the 1976 Plans of the § 3161(h) exclusions for retrials, viewed in the context of the overall purpose of gradual compliance with the Speedy Trial Act, see 18 U.S.C. §§ 3163–66,[23] is a cogent indication that the more restrictive "in any event" language of the 1975 Plans should not be read literally. Viewed in this historical context, that language appears to have had the purpose of signalling the final demise of the "good cause" escape hatch.

We reject the claim of Michael J. Tiche that failure to commence his second trial within 60 days of the declaration of a mistrial in his first trial violated paragraph 7 of the District of Connecticut Plan for Prompt Disposition Of Criminal Cases.

We have considered appellants' other claims of error and find them without merit.

Appellants were convicted after fair trials on the basis of overwhelming evidence of serious crimes committed more than two years ago. We order that the mandate issue forthwith.

Affirmed.

---

**23.** This assumes that the exclusions of § 3161(h) are applicable to the 60 day retrial provision, § 3161(e). Since this question is not presented by the record in the instant case, we do not decide it.